ATLANTIC NORTHERN AIRLINES, INC., A BODY COR-
PORATE, PLAINTIFF-APPELLANT, v. ADOLPH W.
SCHWIMMER, DEFENDANT-RESPONDENT.

Argued February 24, 1953—Decided April 27, 1953.

294

*Messrs. Raymond C. Connell* and *William Harris* argued the cause for appellant.

*Mr. Willard G. Woelper* argued the cause for respondent (*Mr. W. Orvyl Schalick,* of counsel; *Mr. Harry Adler,* attorney).

The opinion of the court was delivered by

HEHER, J. The action is in tort for conversion on August 12, 1948 of plaintiff's DC-4 airplane, NC 58021, and for the value of its use during the succeeding five months. Defendant was a nonresident; and the proceeding was instituted by the issuance of a writ of attachment on June 13, 1949 against two airplanes in defendant's name, under *N. J. S. A.* 2:42–86 *et seq.,* superseded by *N. J. S.* 2A:26–1 *et seq.*

The complaint alleged the conversion of the subject airplane and defendant's subsequent promise "to pay the plaintiff for the use of the aircraft the sum of $57,000 per month, from August 12, 1948," or a total of $285,000, and default in payment. Defendant answered denying the averments of the complaint save as to his nonresidence, and pleaded, *inter alia,* plaintiff's execution and delivery to a corporate third party, Alsam, Ltd., a private domestic corporate being under the laws of the State of Israel, of a general release inclusive of the claim in suit, in consideration of $300,000 paid to it by one Hay Issaharow, who was then president of Alsam, Ltd., of whom more hereafter. Defendant thereupon posted a bond; and the attached airplanes were returned to him, and the cause proceeded to trial in the

usual course on the complaint and answer. At the pretrial conference, the complaint was supplemented by a count alleging that "the reasonable rent for" the airplane, for the period of use "after its illegal taking, would have been $285,000." Defendant's answer was amended to contain a denial of the additional count.

The issue came on for trial before Judge Woods, sitting without a jury, and there was judgment for defendant. It was found that plaintiff had not sustained the burden of proving that defendant had taken possession of the airplane, or had had the use of it, or had agreed to pay for the value of the use; and, moreover, that plaintiff's release served to discharge defendant from liability on the claim in suit, if such there was when the release was given.

The points made are: (1) error in the denial of plaintiff's motion made at the pretrial conference to strike out the defense of release, and in the admission at the trial of what is conceived to be evidence in violation of the terms of the release; (2) error in the admission of the testimony of witnesses not included in the response to a demand made pursuant to *Rule* 3:26–2; and (3) that the "verdict" was against the weight of the evidence.

The contention of defendant is that it was not he but Alsam, Ltd. who made use of the airplane, and that the stated sum of money was paid by that company to plaintiff in full reimbursement for the loss of the airplane and its use, and the release was designed to and did in fact comprehend both elements of property.

This is the history and the circumstances:

On May 15, 1948 the State of Israel was formally established following the withdrawal of the Government of Great Britain from Palestine and was accorded immediate recognition by the Government of the United States. The Israeli Government and the Arab nations were then in a state of war. A vice-president of the plaintiff corporation, Rowland, testified that in February 1948, in Paris, France, he rented the aircraft in question to one Freddikins, acting for "the Jewish Movement which was interested at that time in flying

cargo to Palestine from Czechoslovakia," later identified by the witness as "gun-running," a hazardous enterprise which brought a return designed to be commensurate with the risk. Another vice-president of plaintiff, Lerner, said that shortly thereafter, in April 1948, the contract was renegotiated in Paris with Freddikins and one Breiger, representing the "Israeli Government, or what was at that time representing the Jewish people in the country of Palestine," and "later became the Israeli Government." Plaintiff's president, Cox, testified that Breiger was then "representing the Palestinian movement." The State of Israel had not then come into being. On July 3, 1948, following the formation of the new state, plaintiff leased the airplane to Issaharow, then also Deputy Minister for Air of the State of Israel. The agreement provided for compensation at the rate of $380 per hour with a minimum guarantee of 150 flight hours per month, or a minimum payment of $57,000 per month. Issaharow undertook to pay for "gasoline, maintenance, oil and crew support east of Paris." But it seems that plaintiff supplied a crew of five; indeed "everything but the gasoline and maintenance." The contract contained a cancellation clause. The last flight of the airplane under the contract was made August 11, 1948, and the contract was cancelled by letter dated September 11, 1948, as of September 26, 1948. All obligations under this contract seem to have been discharged.

It is established—the evidence in this regard is uncontradicted—that during this period defendant was an employee of the Jewish Agency for Palestine, assigned to the American section. The Jewish Agency for Palestine was a creature of the mandate for Palestine granted by the League of Nations shortly after the close of World War I. Following the withdrawal of the British Government from Palestine, and the partition of the land, the American section of the Jewish Agency deemed it prudent to have at hand a number of large four-motor transport planes, as a means of keeping "at least one lifeline open to bring out American citizens and bring in medicines, and so forth," in the event that Jewish Palestine, which subsequently became Israel, "would be cut

off from the rest of the world." The technical skill and expert knowledge of defendant in this field were enlisted by the Agency; and it would seem that defendant did not act for the Israeli Government or on his own account in the transactions now made the basis of the claim of conversion and use against him.

The airplane was wrecked January 2, 1949, in the Mediterranean Sea off the coast of Israel. Plaintiff's president, Cox, said the airplane crashed off the shore of Tel Aviv on a return flight from "an urgent military mission" to Czechoslovakia. He was then at Tel Aviv, negotiating for the repossession of the airplane. He arrived there December 14, 1948, but his efforts had not borne fruit when the airplane was destroyed. Continued negotiations eventuated on January 10, 1949 in the settlement and release which are now in controversy. Defendant was in attendance at the conference preceding the settlement, but it is reasonably inferable from the circumstances that he was merely there as a technical advisor and not as a principal or participant in either the conversion or the use of the airplane. No unfavorable inference material to the issue is derivable from this circumstance.

The airplane was purchased from the War Assets Board in June 1946 for $90,000, "unconverted," and was reconditioned at an additional expense of between $50,000 and $60,000. It was carried on the books of the company as a capital investment of $150,000, and at the time of the mishap was insured with Lloyds of London for "between $130,000 and $160,000." Plaintiff's president explained that the insurance had been reduced "because we couldn't afford to keep the high premiums up any longer."

Plaintiff's motion to strike out the first separate defense pleading the general release given to Alsam proceeded on the asserted ground that the release is not inclusive of "any payment for the illegal use" of the airplane; and it is also assigned for error that evidence was received in the course of the trial tending to show that the consideration for the release did in fact, by the design of the parties, comprehend

an allowance of $54,000 for use of the plane after the alleged conversion, and therefore the release constitutes a bar to the action.

This is the release in substance: In consideration of the stated sum of $300,000, paid and to be paid by Issaharow, plaintiff discharged Alsam "and all persons acting for it and on its behalf, and any other person or persons, body or corporation in Israel from all claims or demands whatsoever in connection with the crashed D. C. 4 aircraft No. N. C. 58021 which was destroyed off Tel Aviv on the 2nd of January, 1949." There was provision for subrogation as to the right of salvage and indemnity insurance.

## I.

It is suggested that the release may not be invoked by defendant "because he was working for the Jewish Agency for Palestine of the United States and was not in any way employed by Alsam, Ltd."

 Even so, if the release has extinguished the right of action for use, it is pleadable in bar of this action; and the "parol evidence rule" is applicable. The rule operates "in favor of or against a third party who was not a party to the written integration." *Corbin on Contracts* (1951), *section* 596. If there be a complete written integration, the rule is the same no matter who asserts or denies the release; the intention of the parties is equally binding upon strangers to the instrument. Compare *Essington v. Parish,* 164 *F.* 2d 725 (7 *Cir.,* 1947).

 Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of

extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant. The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose. *Casriel v. King*, 2 *N. J.* 45 (1949).

██ The "parol evidence rule" is a rule of substantive law not related to interpretation or the admission of evidence for the purpose of interpretation. Oral testimony of facts relevant to meaning are not within that principle. Parol evidence cannot be said "to vary or contradict a writing until by process of interpretation it is determined what the writing means. * * * Such testimony does not vary or contradict the written words; it determines that which cannot be varied or contradicted." *Corbin on Contracts, section* 579. The "parol evidence rule" purports to exclude testimony "only when it is offered for the purpose of 'varying or contradicting' the terms of an 'integrated' contract; it does not purport to exclude evidence offered for the purpose of interpreting and giving a meaning to those terms. The terms of any contract must be given a meaning by interpretation before it can be determined whether an attempt is being made to 'vary or contradict' them." *Ibid. sections* 536, 543.

██ The "proper legal meaning" is not always the meaning of the parties to an integration. Surrounding circumstances "may stamp upon a contract a popular or looser meaning"; and it may become the function of the triers of the facts to "fix the sense in which the words were used" in the particular contract. *Utica City National Bank v. Gunn*, 222 *N. Y.* 204, 118 *N. E.* 607, 608 (*Ct. App.* 1918),

Cardozo, J. *Vide, Corn Exchange National Bank v. Taubel,* 113 *N. J. L.* 605 (*E. & A.* 1934). "The constant object of construction is to attain the intent; * * * implications shall supply verbal omissions; the letter shall give way; every inaccuracy of grammar, every impropriety of terms shall be corrected by the general meaning, if that be clear and manifest." Lord Mansfield in *Chapman v. Brown,* 3 *Burr.* 1626, 1634 (1765). And to the same end, the antecedent negotiations and attendant circumstances may be shown by parol to make plain the meaning of the written words. Language is only too often an imperfect and uncertain means of communicating ideas and concepts. Professor Corbin says that rarely in a litigated case do the words of a contract convey "one identical meaning to the two contracting parties or to third persons." *Corbin on Contracts, sections* 536, 560. Litigation proceeding from the poverty of language is constant.

Here, defendant adduced evidence tending to show the deliberate omission from the release of the parties' inclusion in the consideration price of an allowance of $54,000 for the loss of use of the airplane, in order to afford plaintiff the benefit of the capital gain provision of the federal tax statute. But, distinguishing between the phrases "the crashed aircraft" and "the crash of the aircraft," respondent suggests that "It would be difficult to draft an instrument of release any more comprehensive with reference to the aircraft."

The true consideration of a deed may be shown by parol, though it vary from that expressed in the deed, but not to vary or enlarge the grant; and a parol agreement by the grantee that he will assume the mortgage indebtedness upon the land conveyed, as part of the consideration for the conveyance, is valid and enforceable. *Dieckman v. Walser,* 114 *N. J. Eq.* 382 (*E. & A.* 1933).

Where the parties have made the writing the sole repository of their bargain, there is the integration which precludes evidence of antecedent understandings and negotiations to vary or contradict the writing. This is in essence the "parol evidence rule," a rule of substantive contract law

that on principle would seem to be applicable alike to written as well as parol evidence. But the rule has no pertinency where the inquiry involves the true consideration and the truth of the acknowledgment of payment in deeds of conveyance and other written instruments; for the acknowledgment of receipt is not a part of an "integration" of the terms of agreement intended by the parties as a substitute for all antecedent negotiations on the subject matter. The acknowledgment of receipt is in no sense conclusive, but merely evidence which is subject to rebuttal by any kind of relevant testimony. But where the deed or release or like writing is assented to as a complete integration of the terms of the agreement, the rule making the antecedent negotiations immaterial applies "as definitely to what the agreed consideration was as to any other term or provision, although not to its payment or performance." *Corbin on Contracts, sections* 573, 586.

Whether a particular subject of negotiation is embodied by the writing depends wholly upon the intent of the parties; but the intent must be judged by an external standard. The writing is not "wholly and intrinsically self-determinative of the parties' intent to make it the sole memorial" of the subject of negotiation; this intent "must be sought where always intent must be sought, namely, in the conduct and language of the parties and the surrounding circumstances. The document alone will not suffice. What it was intended to cover cannot be known till we know what there was to cover. The question being whether certain subjects of negotiation were intended to be covered, we must compare the writing and the negotiations before we can determine whether they were in fact covered." *Wigmore on Evidence (3rd ed.), sections* 2413, 2430, 2431.

 A receipt or written acknowledgment is not ordinarily intended to be an exclusive memorial, and the facts may be shown however the receipt may be termed. "A receipt is an admission only; and the general rule is that an admission, though evidence against the person who made it and those claiming under him, is not conclusive evidence

(except as to the person who may have been induced by it to alter his condition). A receipt therefore may be explained." *Graves v. Key*, 3 *B. & Ad.* 313 (1832). But where the writing "is itself the very act, as where it grants a discharge or release of a claim, or embodies a new obligation, it obviously falls within the rule, and its terms cannot be overthrown." *Wigmore on Evidence, section* 2432. "A release cannot be contradicted or explained by parol, because it extinguishes a preexisting right. But no receipt can have the effect of destroying '*per se*' any subsisting right; it is only evidence of a fact. The payment of the money discharges or extinguishes the debt; a receipt for the payment does not extinguish the debt; it is only evidence that it has been paid." *M'Crea v. Purmort*, 16 *Wend.* 460, 473 (1836). See, also, *Bunker v. Great Falls Mfg. Co.*, 84 *N. H.* 84, 146 *A.* 529 (*Sup. Ct.* 1929). Where the statement of a consideration is in itself "an operative part of a contractual act,—as when in the same writing the parties set out their mutual promises as considerations for each other," the word "'consideration' signifies a term of the contract, and hence the writing alone can be examined"; a recital of consideration received is, like other admissions, disputable so far as concerns the thing actually received, but "so far as the terms of a contractual act are involved, the writing must control, whether it uses the term 'consideration' or not, and therefore the terms are not disputable." *Wigmore on Evidence, section* 2433.

The case of *Baum v. Lynn*, 72 *Miss.* 932, 18 *So.* 428, 430, 30 *L. R. A.* 441 (*Sup. Ct.* 1895) is apposite. There, in a deed I. recited that whereas L's guardian had loaned money to I., I, in consideration of a full release from such loans, and of $10 paid in hand, conveyed, etc.; the fact that a release of the guardian's liability to L. was also a part of the consideration was excluded. In sustaining the ruling, Cooper, C. J., said:

"'* * * A release cannot be contradicted or explained by proof, because it extinguishes a pre-existing right. But no receipt can have the effect of destroying *per se* any subsisting right. It is

only evidence of a fact. The payment of the money discharges or extinguishes the debt. A receipt for the payment does not pay the debt. It is only evidence that it has been paid. Not so of a written release. It is not only evidence of the extinguishment, but is the extinguishment itself.' The deed now under examination contains, as is clearly to be seen, no mere recital of a consideration paid or to be paid. * * * One transferred a right; the other released a right. If it be said that the release was a mere recited consideration for the conveyance, it may with equal accuracy be replied that the conveyance was a mere recited consideration for the release; and therefore, if one of the terms of the contract may be varied by parol, because it is a consideration, so also may the other for the same reason, and by this process a solemn and executed written contract would be totally eaten away. The true rule is that a consideration recited to have been paid or contracted for may be varied by parol, while the terms of a contract may not be, though the contract they disclose may be the consideration on which the act or obligation of the other party rests."

Thus, the basic question here is whether the parties assented to the writing as the complete integration of their agreement. The writing itself is not conclusive of this issue. But it is an influential evidential factor, even though not necessarily decisive on this factual inquiry. The intrinsic force of the writing as an integration is not overthrown by the parol testimony of a conscious intentional omission from the written expression of the components of the consideration and thus to show the actual inclusion in the stated consideration of a stipulated allowance for use value. The intent of the parties is to be found in the writing as the sole memorial of their bargain, and it operates as a bar to this action. The words of coverage, however they may be viewed in the abstract or in context, are yet made plain when considered in the setting of the surrounding circumstances. It is inconceivable that in making this settlement plaintiff did not regard the corporate entity thus assuming full responsibility for the value of the airplane as also liable for its use, and to have bargained accordingly. Possession, whether tortious or not, was taken for use. The airplane was destroyed while in use, and Alsam assumed liability for the loss. The circumstances denote full settlement for value and use, a cause of action not ordinarily divisible. There is no suggestion of

a disclaimer by Alsam of liability for use and a bargain on that basis. Quite the contrary. The inference is compelling that the parties employed the language of the acquittal clause in this comprehensive sense. Alsam and all persons "acting for it and on its behalf" and "any other person or persons, body or corporation in Israel" are discharged from "all claims or demands whatsoever in connection with the crashed" aircraft. The phrase "in connection with" has a connotative significance extending beyond the concept of damages ensuing from the crash itself. The terms are all-inclusive, both as to persons and property. All claims and all persons are discharged. Words that in themselves are of doubtful import may be made certain and definite in the context of the surroundings. The particular meaning and usage emerge when the words are related to the circumstances. The uncertainties of language being what they are, words used to express the common intention cannot be assessed with a reasonable degree of assurance unless the circumstances which attended their utterance be considered. Semantics cannot be allowed to twist and distort their obvious meaning in the minds of the parties.

We are not here concerned with the principle that extrinsic evidence is admissible in equity to relieve against the consequences of fraud, accident, surprise, or mistake. The remedial process of reformation or rescission for fraud or mistake is not invoked. *Vide Downs v. Jersey Central Power & Light Co.*, 117 *N. J. Eq.* 138 (*E. & A.* 1934) ; *Corbin on Contracts, section* 580.

It suffices to add that, even though the release is not an effective bar to the pleaded cause of action, the judgment is not contrary to the weight of the evidence.

Plaintiff concedes that defendant was in the service of the Jewish Agency for Palestine, and had no employment with Alsam. But it is said that defendant "as an individual or as part of a group and Alsam, Ltd. rented the airplane owned by the plaintiff to the Government of Israel at prices to give them greater gain." This is a suppositious hypothesis without tangible basis in the proofs. Defendant's role was

that of a technical advisor; the finding of the hearing judge that he was not guilty of the conversion or the unlawful use of the aircraft is well grounded in the evidence. In assessing the evidence, due consideration is to be had for the peculiar opportunity of the trial tribunal to judge of the credibility of the witnesses. *Rule* 1:2–20(*a*).

## II.

Error is also assigned upon the admission of evidence at defendant's instance from four witnesses not named in response to a demand by plaintiff purportedly made under *Rule* 3:26–2, now superseded by *Rule* 3:16–2, providing for the disclosure of "the identity and location of persons having knowledge of relevant facts."

It would seem that a demand couched in these terms would not, without more, call for the identification of witnesses upon whom the adversary party intends to rely on the trial, under pain of a loss of their testimony. *Vide Frankel v. Sussex Poultry Co.*, 45 *Del.* 264, 71 *A.* 2d 754 (*Super. Ct.* 1950); and the interpretation of comparable federal rules in *Fidelis Fisheries, Inc. v. Thorden*, 12 *F. R. D.* 179, 16 *F. R. Serv.* 552 (*D. C. N. Y.* 1952), in *Coca Cola Co. v. Dixi-Cola Laboratories, Inc.*, 30 *F. Supp.* 275 (*D. C. Md.* 1939), and in *McNamara v. Erschen*, 8 *F. R. D.* 427, 12 *F. R. Serv.* 395 (*D. C. Del.* 1948). Compare *Evtush v. The Hudson Bus Transportation Co.*, 7 *N. J.* 167, 27 *A. L. R.* 2d 731 (1951). There, inquiry was made for the names of then known "eyewitnesses" to an accident; and the response was false. Here, the question was: "What other witnesses do you intend to produce?" and the answer was: "There may be others, but I don't have knowledge of them at this moment, the reason being I have been quite detached from this thing. I have been chasing around, and been quite busy, and gave no attention or time to this at all."

It is not suggested there was a design to mislead. The answer indicated a disclosure of the witnesses whom defendant then intended to call to the stand; and subsequent interro-

gation and a colloquy between counsel made it plain that the particular answer was not to be deemed a bar to "witnesses that might be discovered at a subsequent date." *Mala fides* is not shown nor charged. It was not to be expected that defendant had then made full preparation for trial and was aware of the witnesses he would need in defense; nor was he under any obligation to be so advised at that stage of the proceedings. And the testimony in defense would in substantial measure depend upon the case made by plaintiff. But it is urged there was a duty of disclosure at some time before "the actual production of the witnesses." The rule does not so provide. *Capone v. Norton*, 8 *N. J.* 54 (1951).

The genius of this rule is pretrial discovery to preclude concealment and surprise in aid of a just result on the merits. Considering the particular circumstances in the light of the policy, plaintiff did not suffer prejudice. There was no objection to the testimony of two of the witnesses. As to the third, Gross, the witness was excused when the point of surprise was made, on January 10, 1951, subject to recall when the hearing was resumed on February 9 ensuing; and it was then that he testified. This was an exercise of judicial discretion that nullified the plea of surprise. As to the fourth, Giladi, the witness merely testified that Issaharow had been Deputy Minister for Air in the Government of Israel, and was then deceased, undisputed and indisputable facts plainly not harmful by the manner of their admission into evidence.

This is on the assumption that the evidence thus adduced involved facts relevant to the issue properly within the cognizance of the court.

Judgment affirmed.

*For affirmance*—Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—None.