**Stanley NOVAK d/b/a Supreme Tire Service**

v.

**GENERAL ELECTRIC CORPORATION**

and

**Union Carbide Corporation.**

**Civ. A. No. 38936.**

United States District Court

E. D. Pennsylvania.

Sept. 29, 1967.

Blank, Rudenko, Klaus & Rome, Philadelphia, Pa., by Edwin P. Rome, Phillip C. Patterson, Charles H. Baron, for plaintiff.

Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., by Charles I. Thompson, and Sullivan & Cromwell, New York, New York by William Piel, Jr., J. Marshall Welborn, Jr., for defendant, General Electric Co.

Drinker, Biddle & Reath, Philadelphia, Pa., by Lewis H. Van Dusen, Jr., Robert S. Ryan, for defendant, Union Carbide Corp.

HIGGINBOTHAM, District Judge.

## OPINION

On June 30, 1967, I issued an order denying the motions of defendants for partial summary judgment based on the release of January 14, 1962 and the cross motion of plaintiff for summary judgment as to the scope of that release. The order was issued prior to the time this opinion was prepared in its now final form in order to expedite the continuation of discovery and other pretrial preparations.

Nevertheless, I believe that the questions presented by the motions, particularly insofar as their disposition will affect the conduct of this litigation, warrant full discussion and explication. This opinion is intended to provide the explanation of the reasons for and the effect of the above mentioned order.

### I.

### STATEMENT OF THE CASE

This case is before me on the motions of both defendants, General Electric Corporation (hereafter referred to as "G.E."), and Union Carbide Corporation (hereafter referred to as "Carbide"), for partial summary judgment based on the asserted applicability of a release executed by plaintiff, Novak, for the benefit of Carbide in 1964. Jurisdiction is conferred on this Court by 28 U.S.C.A. § 1331,[1] because the claims asserted by the plaintiff arise under the federal antitrust laws—15 U.S.C.A. §§ 13(a), (b), (c), (e), (f), 15, 22, 26 [2] and 45.[3]

### II.

### FACTUAL BACKGROUND

In June 1962, Stanley Novak and his then partner, Walter Svihla, by their attorney, David Novack of Camden, New Jersey, commenced an action against Carbide in the United States District Court for the District of New Jersey,[4] alleging that Carbide had violated the Robinson-Patman Act by selling "Prestone" brand anti-freeze at different prices to certain competitors from that at which it would sell to plaintiffs.[5] Carbide defended by asserting cost justification for any such differences. The case was called for trial on November 12, 1963. That afternoon, the parties engaged in further settlement negotiations which resulted in a tentative agreement that Carbide would pay plaintiffs $5,000 in return for which plaintiffs would agree to a dismissal of their suit with prejudice and would execute a release for the benefit of Carbide. On November 14, 1963, Carbide's local counsel, Joseph Kenney, Esquire, sent to plaintiffs' attorney a draft of a release for his approval and the signature of plaintiffs. A copy was forwarded to plaintiff, Novak, late in November. At the insistence of plaintiffs' counsel, the draft was changed so that the $5,000 would not appear to be paid as "counsel fees", and on December 19, 1966 was returned to plaintiffs' attorney. He forwarded it to plaintiff Novak shortly thereafter. It was signed and verified on January 13, 1964.[6] Payment was made shortly thereafter, and a judgment was entered dismissing the action "with prejudice".

Thereafter, on September 24, 1965, Stanley Novak filed a complaint in this Court commencing this action alleging price discrimination by both G.E. and Carbide in the sale of miniature and sealed beam lamps in the automotive aftermarket in violation of the Clayton Rob-

---

1. 62 Stat. 930 (1948), as amended, 72 Stat. 415 (1958).

2. 38 Stat. 730 (1914), as amended, 49 Stat. 1526 (1936).

3. 38 Stat. 719 (1914), as amended, 43 Stat. 939 (1925); 52 Stat. 111 (1938), 52 Stat. 1028 (1938), 62 Stat. 991 (1948), 63 Stat. 107 (1949), 64 Stat. 21 (1950), 66 Stat. 632 (1952), 72 Stat. 809 (1958), 72 Stat. 942 (1958), 72 Stat. 1750 (1958), 74 Stat. 200 (1960).

4. Civil Action No. 464–62.

5. Exhibit "A" to Plaintiffs' Brief re Motions for Partial Summary Judgment Based on Release.

6. Affidavit of Joseph Kenney, Esquire, July 7, 1966, submitted in support of "Motion for Partial Summary Judgment Based on A Release" filed by Carbide, July 15, 1966.

inson-Patman and Federal Trade Commission Acts.

Both G. E. and Carbide have moved for summary judgment, asserting that the release precluded this suit. In support of this motion, Carbide has submitted several affidavits and the deposition of plaintiff. G. E., while not a party to the earlier suit, nor mentioned in the release, claims that since its relation to Carbide, under plaintiff's theory of the wrong, would be that of either principal to agent or joint tortfeasor, it, too, is protected by the release. Both petitioners also assert that since they are, in fact, in the relationship of principal and agent, insofar as the marketing of automotive lamps is concerned, G. E. is not required by the Act to offer those lamps to others at the same prices paid by Carbide.

### III.

### DISCUSSION

A. *Applicable Rule for Decision*

At the threshold we are met with a difficult problem. "Federal law is generally interstitial in its nature. It rarely occupies a legal field completely, totally excluding all participation by the legal systems of the states. * * * Federal legislation on the whole, has been conceived and drafted on an *ad hoc* basis to accomplish limited objectives. It builds upon legal relationships established by the states, altering or supplanting them only so far as necessary for the special purpose. * * *" [7]

■■■■ The antitrust statutes themselves provide no rule for interpreting releases of antitrust claims as to either what claims or what parties are released. Yet, as petitioners urge, since the issue involves the alleged release of a federally created right, it is a "federal question" and one which the federal courts must be *competent* to answer without regard to state law. [8] Thus, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), Klaxon v. Stentnor, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and the cases which followed them, holding that a federal district court in a suit based on diversity of citizenship jurisdiction *must* apply the same rules for decision as would a state court in that state, are inapplicable.

■■■■ On the other hand, federal courts are not bound to create a new rule for decision of every aspect of every "federal question". To the contrary, they should consider the problem, as Congress must have done when it enacted the relevant legislation, in the light of the existing body of state law. Indeed they may even choose to apply the state rule directly. Reconstruction Finance Corporation v. Beaver County, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946), cf. United States v. Yazell, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966). The factors to be considered in making this choice are similar to those which determine knotty issues of statutory construction when legislative history is unhelpful:

1. The requirement—if any—of the federal program for a single rule for decision to be applied uniformly throughout the country.

2. The relationship of the transaction in question to the normal course of activities regularly decided under state law.

3. The relationship of the state rule to the federal policy and to related aspects of the federal program of which the statute in question is a part. [9]

"* * * [T]he problem involves more than merely arriving at one or another substantive rule for decision,

---

7. Hart and Wechsler, The Federal Courts And The Federal System, 435 (1953).

8. Cf. Sola Electric v. Jefferson Electric, 317 U.S. 173, 63 S.Ct. 172, 174, 87 L.Ed. 165 (1942); Garrett v. Moore-McCormack, 317 U.S. 239, 245, 63 S.Ct. 246, 251, 87 L.Ed. 239 (1942).

9. Mishkin: The Variousness of "Federal Law": Competence and Discretion In The Choice of National and State Rules For Decision, 105 U.Pa.L.Rev. 799, 811 (1957).

but deciding whether to formulate * * * a rule at all or to refer the determination to state law. * * * In the present context, this would involve consideration not only of the best substantive result on the particular issue, but also balancing against the possible gain from prescribing such a rule, the potential losses from non-integration of the national program with normal state activities." [10]

## B. Relevance of State Law

In addition to the general counselling of clients and the normal state court activities of attorneys, a substantial portion of cases instituted in federal courts involve the application of state law.[11] Most cases are settled by agreement of the parties before judgment.[12] In addition, many matters are settled by the parties even before a suit is filed. Generally, settlements involve the execution of releases. Thus, the preparation of releases and the local law governing them are necessarily part of the stock-in-trade of every lawyer—something he deals in almost daily. I can perceive great difficulty for counsel and the possibility of substantial injustice to litigants should I decide that for all questions related to claims—or defenses—under the antitrust laws a separate and distinct set of "federal" rules for determining the scope and effect of the language used in releases had to be utilized.

The instant case provides a prime example of the relevance of state law. In the prior Camden action, Carbide was represented by both their present Philadelphia counsel and by Joseph Kenney, Esquire, of Camden, a member of the New Jersey Bar. Mr. Kenney conducted the negotiations leading to the settlement and the execution of the releases here in issue. Carbide, in fact, leans heavily on the correspondence between Mr. Kenney and Mr. David Novack, Esquire, then counsel for the plaintiffs, to establish that plaintiff knew or had ample reason to know that he was signing a "general release". Indeed, one of the documents submitted to support this motion for summary judgment is an affidavit of Mr. Kenney detailing the course of negotiations. The affidavit states:

"3. At the request of Union Carbide's Philadelphia Counsel, I drafted a general release * * * following the normal New Jersey form of general release. * * * " [13]

Other correspondence submitted by Carbide indicates that Philadelphia counsel had greater experience in antitrust matters than did Mr. Kenney. Yet they asked him to draw the release in that case. Evidently, Mr. Kenney's familiarity with local law and practice were thought to be relevant to the preparation of a release albeit a release of claims under the federal antitrust laws.

## C. Authority

Petitioners have cited several cases to support their contention that since federal antitrust claims were involved in the prior case and are here involved, the effect of the 1964 release is to be determined by the application of a federal rule. I find the authority to be to the contrary.

---

10. Id. at 812.

11. In 1965, slightly under ⅓ of all cases filed in United States District Courts (including criminal, habeas corpus, bankruptcy, admiralty and civil matters) were based on Diversity of Citizenship Jurisdiction. Annual Report of the Director of the Administrative Office of the United States Courts, 105 (1965).

12. In fiscal 1964, for example, only 11.4% of all cases in United States District Courts reached trial while 49.4% were terminated without any court action. Allowing for default judgments and dismissals for want of prosecution, a very substantial number of cases must have been settled by the parties before any court action. This does not account for a further substantial number of cases which are settled after some court action but before final judgment and exhaustion of all procedures for review.

13. N. 6, supra. Mr. Robert Ryan, Esquire, Philadelphia counsel for Carbide in both suits stated, in argument before me on June 20, 1966 that the release was drawn according to New Jersey forms. (N.T., p. 7).

Dice v. Akron, 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952) is the leading case cited by petitioners. It arose under the Federal Employers' Liability Act (FELA).[14] The defense interposed was that the plaintiff-employee had executed a release which effectively barred the suit in question. The Ohio Supreme Court, reversing the intermediate appellate court, held the Ohio's state law rather than a federal rule would apply to test the sufficiency of plaintiff's proof in support of his claim of fraud in inducing him to sign the release. The Supreme Court reversed, holding that a federal rule rather than Ohio's requirement (of "clear, unequivocal evidence" to be determined by the judge rather than jury) must be applied by the state courts of Ohio.

Carbide argues that here, *a fortiori*, a federal court must apply a federal rule. Such an argument fails to take cognizance of the rational of *Dice*, supra, that the particular *state rule there applied directly contravened the federal policy*. Both the right to a jury trial on all relevant issues[15] and the special protection of a quasi "ward" [16] of the Congress—which would hardly support placing on him the stringent burden of proof required by Ohio law—were rights which Congress had conferred upon plaintiff and with the enjoyment of which the application of Ohio rules substantially interferred.[17]

Petitioner's reliance on Sola Electric v. Jefferson Electric, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942), is also misplaced. That case was brought under diversity of citizenship in a federal District Court to recover unpaid royalties under a license agreement covering plaintiff's product. Defendant-licensee moved for summary judgment on the ground that the patent which allegedly covered plaintiff-licensor's product had been held to be invalid, and that therefore the price fixing provision in the license agreement (which would have accounted for a higher price to licensee and consequently greater royalties to licensor) was in violation of the antitrust laws, and thus unenforceable. The District Court held that the licensee would be estopped to deny the validity of the patent since he had accepted a license thereunder. Furthermore, given the validity of the patent, the price fixing agreement was a lawful exercise of the patent monopoly.

The Supreme Court reversed, holding that despite the dictates of the *Erie*[18] doctrine, federal law was to be applied to determine the effect of the invalidity of the patent on the enforceability of a price fixing agreement covering the allegedly patented product. However, it stated specifically, that it was not deciding whether the applicability of the estoppel principle was a question of state or federal law; but rather that the question presented was " * * * whether the doctrine of estoppel as invoked below [whatever its source] is so in conflict with the Sherman Act's prohibition of price-fixing that * * * [the Supreme Court] may resolve the question even though its conclusion be contrary to that of a state court.

" * * * It is a familiar doctrine that the prohibition of a federal statute may not be set at naught, or its benefits denied by state statute or common law rule. In such a case, * * * [the] decision is not controlled by Erie Railroad v. Tompkins * * *. To the federal statute and policy, *conflicting state law and policy must yield*. Con-

---

14. 35 Stat. 65 (1908) as amended 53 Stat. 1404 (1939).

15. Dice v. Akron, 342 U.S. 359, 362–363, 72 S.Ct. 312, 315, 96 L.Ed. 398 (1952).

16. Id. 342 U.S. at 361, 72 S.Ct. at 314, citing Garrett v. Moore-McCormack, supra, n. 8, 317 U.S. at 244, 63 S.Ct. at 250.

17. Dice v. Akron, supra, n. 15, 342 U.S. at 362, 72 S.Ct. at 314.

18. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Klaxon v. Stentnor, 313 U.S. 487, 61 S. Ct. 1020, 85 L.Ed. 1477 (1941).

stitution, Art. VI, cl. 2 * * *."[19] (Emphasis added.)

For analogous reasons, Taxin v. Food Fair Stores, 197 F.Supp. 827 (E.D.Pa. 1961) is inappropriate. Citing only Sola Electric v. Jefferson Electric, supra, the District Court there held that federal rather than state law would control the question of the necessity for one who seeks to set aside a settlement on the ground of fraud to first tender back the consideration received by him in settlement. Reliance on the state (Pennsylvania) rule would have created a burden on persons claiming damage under the federal antitrust laws and claiming that a release previously signed by claimant was induced by fraud.

Twentieth Century-Fox etc. v. Winchester etc., 351 F.2d 925 (9th Cir. 1963), is also distinguishable. The Court of Appeals for the Ninth Circuit recognized that there was a conflict as to whether a state or a federal rule governs the effect of a release in a federal antitrust case. " * * * Considering that federally created rights regarding interstate transactions * * * "[20] were involved, they found that both the outcome and the Supreme Court's language in Dice v. Akron, supra, compelled the conclusion that a federal rule of uniform application throughout the country was necessary.

Despite my belief that *Dice* does not lead inexorably to the creation and imposition of federal rules for all issues involving federally created rights and potential interstate transactions, I need not quarrel with the Ninth Circuit's application of it in *Twentieth Century Fox,* supra, because the question there was whether the release of one joint tortfeasor released all other alleged joint tortfeasors; while I am faced with the problem of interpreting and construing a contract document in order to ascertain its meaning as to the original parties. The former question is one of merely choosing one from several possible rules concering the release of joint tortfeasors. While the rule chosen by the Ninth Circuit in *Twentieth Century Fox,* supra, did conflict with the state rule which the District Court would have applied,[21] it is possible that they concluded that, for example, in a case where the alleged joint tortfeasors were from several different states a single, uniform federal rule would be preferable.[22]

In the instant case, however, I am faced with the alternative of developing a set of rules for the interpretation of contracts releasing antitrust claims or of adopting the state rules. State law regularly treats cases involving the interpretation of contracts and attorneys draw contracts in the light of their knowledge of this entire body of rules. Unless those rules contravene the federal policy, there is no need to create a superseding body of federal common law, and I deem it unwise to do so.

With the last case on which petitioner relies—Dale Hilton v. Triangle Publications, 198 F.Supp. 638 (S.D.N.Y.1961)— I must respectfully disagree. Its treatment of the federal rule—state rule problem was as follows:

" * * * The court cannot accept the distinction attempted to be drawn by the plaintiff, that the effect of a release as to joint tortfeasors may be governed by federal law, but the question whether the documents are in fact a release should be governed by state law. Since the jurisdiction of the court is predicated on a federal question then federal law must determine all problems arising in the litiga-

---

19. 317 U.S. 173, 176, 63 S.Ct. 172, 174, 87 L.Ed. 165.

20. 351 F.2d 925, 928.

21. Id. at 928–929. The District Court held that it would apply the California rule, Cal.Code Civ.P. § 877, that release of one joint tortfeasor does not release other joint tortfeasors unless it expressly so states. The Court of Appeals applied the Restatement Rule that "a release of one joint tortfeasor releases all others jointly liable unless the release expressly reserves rights against the joint tortfeasors. Restatement, Torts, § 885(1) (1939).

22. Id. at 928.

tion. Dice v. Akron * * * Garrett v. Moore-McCormack * * *." 198 F.Supp. at 639.

My discussion of Twentieth Century Fox v. Winchester, supra, and the approach to this problem set out at Section III(A) of this opinion, supra, supports my endeavoring at least to examine the analytical result of just such a distinction in the case before us. Federal-State relationships necessarily involve balancing interests. "* * * Both theory and the precedents * * * teach us solicitude for state interests * * *. They should be overridden by the federal court only where clear and substantial interests of the National Government, which cannot be served consistently with respect for such state interests, will suffer major damage if the state law is applied." United States v. Yazell, 382 U.S. 341, 86 S.Ct. 500, 507, 15 L.Ed.2d 404 (1966). If the federal policy—which must remain supreme[23] will be satisfactorily effectuated by the application, in a case arising under federal laws, of a rule provided by the state law it would be unwise to complicate the law, the work of attorneys and the understanding of private citizens of their rights and responsibilities by requiring that a separate federal rule be applied to all "* * * problems arising in the litigation * * *" wherein "* * * jurisdiction of the court is predicated on a federal question * * *."[24]

On several occasions, the Supreme Court and lower federal courts have recognized and employed such an analysis. Particularly significant in this respect are Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed. 2d 972 (1957); followed in Zdanok v. Glidden, 327 F.2d 944 (2nd Cir., 1964); Bank of America National Trust v. Parnell, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d

93 (1956) and United States v. Yazell, supra.

Pursuant to its collective bargaining contract, the Textile Workers Union had processed a grievance through the regular procedures culminating in its request that the employer proceed to arbitration. The employer refused and the Union brought suit in the District Court to enforce the arbitration provision of the collective bargaining agreement pursuant to § 301 of the Labor-Management Relations Act, 29 U.S.C.A. § 185.[25] Finding that it had jurisdiction, the District Court ordered the employer to arbitrate. The Court of Appeals for the Fifth Circuit reversed on the ground that although § 301 granted jurisdiction to the federal courts the court had no authority founded in either federal or state law to grant the relief sought.

Certiorari was granted. The Supreme Court reversed the Court of Appeals, holding that § 301 authorized not only jurisdiction in the federal courts to enforce collective bargaining agreements, but also the development of a substantive body of federal common law for the interpretation, construction and enforcement of such agreements.[26] Part of that body of law, it was further held, included specific performance of promises to arbitrate grievances. Thus the statute called upon federal courts to fashion federal law[27] to interpret and enforce collective bargaining agreements pursuant to the Congressional judgment that such enforcement would promote the federal policy of industrial peace through collective bargaining.

The federal policy was no less significant there than it is here. Furthermore, the statute specifically provided for the development of federal common law. Yet, in outlining the manner of effectu-

23. Constitution, Article VI, Cl. 2. Cf. Sola Electric v. Jefferson Electric, 317 U.S. 173, 63 S.Ct. 173, 87 L.Ed. 165 (1942).

24. Dale Hilton v. Triangle Publications, 198 F.Supp. 638, 639 (S.D.N.Y., 1961).

25. 61 Stat. 156 (1947).

26. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

27. Id., 353 U.S. at 456, 77 S.Ct. at 918.

ating by the lower courts of the statutory mandate, the Court said:

> \* \* \* Federal interpretation of the federal law will govern, not state law. \* \* \* But *state law if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy* (emphasis added.)
>
> \* \* \* Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights." 353 U.S. at 457, 77 S.Ct. at 918.

Subsequently, the Court of Appeals for the Second Circuit, in following *Lincoln Mills,* supra, was faced with a problem which focuses directly on the issue now before us.[28] Zdanok v. Glidden, 288 F.2d 99, 90 A.L.R.2d 965 (2d Cir.) affirmed 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), had been brought in the District Court, under diversity of citizenship jurisdiction, to enforce a collective bargaining agreement. New York cases were relied upon to determine the rights of the parties under the contract.[29] After the case was argued on another ground, and affirmed, in the Supreme Court, the District Court granted plaintiff's motion for summary judgment as to the liability of defendant (employer).[30] Returning to the Court of Appeals on interlocutory appeal[31], the employer argued, inter alia, that the prior decision of the Court of Appeals had been based on New York law, that it should have been based on federal law and that under federal law it was erroneous. Accepting the employer's first and second proposition, the Court, per Judge Friendly, rejected the employer's third proposition relying on, and quoting, the above language from Lincoln Mills.

In Bank of America National Trust v. Parnell, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956) the District Court, relying on Clearfield Trust v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), held that in a suit by a bank to recover from persons who had allegedly converted 73 bearer notes issued by the Federal Home Owner's Loan Corporation and belonging to the bank, federal law applied and placed the burden of proof on the plaintiff to show that defendants took the bonds in bad faith. The Supreme Court, per Mr. Justice Frankfurter, reversed, limiting *Clearfield Trust,* supra, to instances where the Government's liability on its own obligations is in issue. It held that in a suit on Government notes between two private parties, the interest of the United States in its ability to market its securities is " \* \* \* far too speculative, far too remote \* \* \* to justify the application of federal laws to *transactions essentially of local concern.*" 352 U.S. at 33–34, 77 S.Ct. at 121. (Emphasis added.)

As recently as last year, the Supreme Court had occasion to review this area and reaffirmed the doctrine of adoption of state rules for decision in "federal questions."[32] Husband and Wife Yazell had conducted, in Lampasas, Texas, an unincorporated business whose assets under applicable Texas law were held as community property of both. As a result of flood damage to this business, the Yazells sought and obtained from the Small Business Administration a "Disaster Loan." The chattel mortgage to secure the loan was signed by both husband and wife. Under the applicable Texas law, a married woman could not bind her separate property without first obtaining a court decree removing her disability to contract.[33]

---

28. Zdanok v. Glidden, 327 F.2d 944 (2d Cir., 1964).

29. It is unclear whether New York law was thought to be binding under Erie, supra, n. 18, or whether the Court chose to apply the New York rule as one which would effectuate the federal policy. See Zdanok v. Glidden, id. at nn. 7, 8, 327 F. 2d 950–951.

30. Zdanok v. Glidden, 216 F.Supp. 476 (S.D.N.Y., 1963).

31. 28 U.S.C.A. § 1292(b), 62 Stat. 929 (1948), as amended, 65 Stat. 726 (1951), 72 Stat. 348 (1958), 72 Stat. 1770 (1958).

32. United States v. Yazell, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966).

33. Vernons Ann.Civil Stat. Art. 4626. This Article has been subsequently amend-

The Yazells defaulted and the Small Business Administration after exhausting both the community property and Mr. Yazell's leviable assets sought to levy execution against Mrs. Yazell's separate property. The District Court, which was affirmed by the Fifth Circuit found in favor of Mrs. Yazell on her defense under the Texas law of coverture. Mr. Justice Fortas, for the Supreme Court, affirmed.

From the opinion the following factors appear to form the foundation for the decision:[34]

1. The entire matter was handled in Texas by the S.B.A. offices in Dallas and Lampasas. Additionally, the S.B.A. advised Mr. Yazell that a particular law firm in Lampasas had been retained to assist him in complying with the S.B.A. regulations.

2. The contract was not a form used by S.B.A. throughout the country, but rather was drawn to take into consideration of the law of Texas.

3. The state law involved is part of the State's body of law concerning the family and family-property arrangements—an area of particularly local interest and responsibility.[35]

In substance, then, there was found a strong local interest in and focus on the

transaction, and no particularly strong interest of the national government—either as a general law making and regulating entity or as an agency administering a particular program—in a uniform national rule. Consequently, the state rule was applied.[36]

▇ We need not go that far, for we find that the law of New Jersey which governs the construction and interpretation of releases affirmatively supports the federal policy of " * * * vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action * * * "[37]

D. *New Jersey Rule Re Interpretation of Release.*

Van Slyke v. Van Slyke, 80 N.J.L. 382, 78 A. 179, 31 L.R.A.,N.S., 778 (1910), was a suit on a promissory note wherein a release given after the execution of the note was raised in defense. A shorthand statement of the facts is necessary to minimize confusion of the parties.

Evert Sheldon Van Slyke (hereafter "son") executed a note naming his father—Evert Van Slyke—as payee. Subsequently son died and his wife was named as one of the executors of his estate. There followed a dispute between

---

ed to permit a married woman to bind her separate property without a prior court decree. Vernons Ann.Civil Stat. Art. 4626 (1963), Acts of 1963, 58th Leg., p. 1188, Ch. 472, § 6.

34. "We do not here consider the question of the constitutional power of the Congress to override state law in these circumstances by direct legislation or by appropriate authorization to an administrative agency coupled with suitable implementing action by the agency. We decide only that this Court in the absence of specific congressional action, should not decree in this situation the implementation of federal interests requires overriding the particular state rule here. * * *" United States v. Yazell, n. 32 supra, 382 U.S. at 352, 86 S.Ct. at 506–507.

35. Id., 382 U.S. at 352, 86 S.Ct. at 502, 503, 506–507.

36. Cf. Reconstruction Finance Corp. v. Beaver County, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946); De Sylva v. Ballantine, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956); Benson v. Jackson, 238 F.Supp. 309 (E.D.Pa., 1965); Solar Electric v. General Electric, 156 F.Supp. 51, 58 (W.D.Pa., 1957).

37. Minnesota Mining and Manufacturing Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 318, 85 S.Ct. 1473, 1476, 14 L.Ed.2d 405 (1965); Lawlor v. National Screen Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955); Bruce's Juices v. American Can Co., 330 U.S. 743, 756, 67 S.Ct. 1015, 1019, 91 L.Ed. 1219 (1947); Byram Concretanks, Inc. v. Warner Concrete Products Co., 374 F.2d 649 (3rd Cir., 1967); The Philadelphia Housing Authority v. American Radiator and Standard Sanitary Corp., 269 F.Supp. 540 (E.D.Pa., 1967).

wife (and the other executor of son's estate) and father—as executor of another estate (that of Sarah D. Van Slyke). Eventually, this matter was settled and father executed a release to the executors of the estate of son. Father thereafter died and mother sued son's wife on the note. Wife set up the release from father in defense. The trial court granted wife's motion for summary judgment *on the ground that it was a "general release."* [38] Mother appealed, and the New Jersey Supreme Court reversed.

The similarity between the release in that case and that executed by plaintiff Novak, in favor of Carbide, is so great that I have set them out verbatim for purposes of comparison.

---

"WHEREAS Evert Van Slyke has submitted an accounting as administrator of Sarah D. Van Slyke, and Adelaide Plume Van Slyke and Lewis H. Allen, as executors of * * * Evert Sheldon Van Slyke, deceased, have opposed such accounting, and Charles M. Aikeman has brought an action among other things to have a certain release proved on said accounting annulled; and whereas the parties on November 27th, 1905, entered into a compromise agreement wherein and whereby they covenanted to adjust their differences as therein provided. NOW, THEREFORE, in accordance with said compromise agreement and for the purpose of carrying into effect its said provisions, know ye, that I, Evert Van Slyke, *for and in consideration of the sum of* one dollar lawful money of the United States, and other valuable consideration, to me in hand paid by Adelaide Plume Van Slyke and Lewis H. Allen, executors of the estate of Evert Sheldon Van Slyke, deceased, have *remised, released and forever discharged, and by these presents do for myself, my heirs, executors, administrators and assigns remise, release and forever discharge the said*

"KNOW ALL MEN BY THESE PRESENTS, that STANLEY NOVAK and WALTER SVIHLA, individually and t/a SUPREME TIRE SERVICE with their principal place of business located on Camden Avenue, Lenola, Burlington County, New Jersey

*for and in consideration of the payment and in consideration of the payment* by UNION CARBIDE CORPORATION OF FIVE THOUSAND DOLLARS ($5,000.00) *to David Novak, Esq.,* 715 Federal Street, Camden, New Jersey, for Stanley Novak and Walter L. Svihla, individually and t/a Supreme Tire Service *in their claim against UNION CARBIDE CORPORATION, arising out of the sale of Prestone anti-freeze during the period*

---

**38.** Carbide places great importance on the continued use of the term "general release" in correspondence among counsel. We think that the New Jersey rule as declared in the Van Slyke case is clear that it is but one of several factors to be considered in seeking to plumb the intentions of the parties.

The New Jersey Supreme Court recently reaffirmed this: "* * * A general release, not restricted by its terms to particular claims and demands ordinarily covers all claims and demands due at the time of its execution and *within the contemplation of the parties.* * * *"
(Emphasis added.) Bilotti v. Accurate Forming Corp., 39 N.J. 184, 188 A.2d 24 (1963).

Adelaide Plume Van Slyke and Lewis H. Allen, executors of the estate of Evert Van Slyke, deceased, their *survivor, successor or successors, of and from all manner of action and actions cause and causes of action,* suits, debts due sums of money, accounts reckonings bonds, bills, specialties, covenants, contracts, controversies, agreements, and promises variances, trespasses, damages, judgment, executions, *claims and demands whatsoever, in law or in equity, which against them I ever had, now have or which my heirs, executors, administrators or assigns hereafter can shall or may have for upon or by reason of any matter, cause or thing whatsoever* and particularly any of the acts of said Adelaide Plume Van Slyke and Lewis H. Allen, executors of the estate of Evert Sheldon Van Slyke, *from the beginning of the world to the day of the date of these presents.* \* \* \* " (Emphasis added.)

*September 1961 and April 1962. The* said Stanley Novak and Walter L. Svihla, individually and t/a Supreme Tire Service have *remised, released, quit claimed and forever discharged, and by these presents do for ourselves and our heirs, executors, administrators and assigns, remise, release, quit claim and forever discharge the said* Union Carbide Corporation, its *successors and assigns of and from all manner of action and actions, cause and causes of action,* suits, debts, dues, sum and sums of money, accounts reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespass damages, judgments, extents execution *claims and demands whatsoever in law and equity* in particular and claim or claims, cause or causes of action under the Clayton Act and Robinson-Patman Act, which against the said Union Carbide Corporation, we ever had or which the said Union Carbide Corporation *we ever had, now have, or which the said Supreme Tire Service ever had, now have, or which our heirs, executors, administrators or assigns hereafter can, shall or may have, for, upon or by reason of any matter, cause or thing whatsoever, from the beginning of world to the day of the date of these presents.*

AND PARTICULARLY, but without in any way limiting the generality of the foregoing, any claim or claims, cause or causes of action alleged to have arisen by reason of the sale of Prestone brand anti-freeze by the Union Carbide Corporation to its national accounts at a price five cents per gallon less than on its sales to its consignment distributors, all of which has been subject of litigation in the United States District Court for the District of New Jersey under Civil Action No. 464–62 wherein Stanley Novak and Walter L. Svihla, individually and t/a Supreme Tire Service were the plaintiffs and Union Carbide Corporation the defendant." (Emphasis added.)

The italicized portions of the two releases constitute—with one exception—the operative language with regard to Carbide's argument that " * * * The language of the release is as general as language can be * * * "[39] On the strength of that language not only could we not say that as a matter of law the present release is greater in scope than that in *Van Slyke,* supra; but it might well be proper to rule that the parties must have intended that their scope be identical. Moreover, the note payable to the father must have been known to him at the time he executed the release to the executors of his son's estate; while here plaintiff alleges no knowledge of his present claim concerning auto lamps when he executed the release at issue. However, I need not and therefore do not so decide for under the New Jersey rule the intention of the parties is to be determined from all of the facts and circumstances as well as the totality of the document.[40] Furthermore, the particular description of the Camden action, which gave rise to the release follows the general words of release[41] and is introduced by the phrase "And particularly, but without in any way limiting the generality of the foregoing. * * * " In both respects the two documents differ.

Considering the position of the general words and the specific words, the New Jersey Supreme Court, in reversing the grant of defendant's motion for a directed verdict in *Van Slyke* said:

* * * The release does not mention the note, either expressly or by implication, and consequently the only theory on which it can be deemed to effect it is that the general words of the release are broad enough to cover it and are not limited or qualified by other language of the instrument so as to be deprived of their full natural force. * * *

(In a release, general terms followed by particular recitals are not governed by the latter. On the other hand, a release in which the specific terms are followed by general terms will be limited to the matters particularly recited.)

This distinction should not be observed too rigidly, but in our opinion should be regarded rather as an aid to interpretation than as the basis of a canon of construction. In other words, while the position of particular recitals may play an important part in aiding an ascertainment of the intent of the releasor, it should not avail to defeat that intent * * *."[42]

More recently, in Atlantic Northern Airlines v. Schwimmer, 12 N.J. 293, 96 A.2d 652 (1953) the New Jersey Supreme Court has reaffirmed this rule. Plaintiff sued in tort to recover for defendant's alleged conversion of its airplane and for the value of its use by de-

**39.** Dura Electric Lamp Co. v. Westinghouse Electric Corp., 249 F.2d 5, 7 (3rd Cir., 1957). That case and the particular quotation were concerned with the question of whether or not a joint tortfeasor was protected by this release to another joint tortfeasor. Since the rule applied there was the Restatement Rule—requiring (1) agreement between the parties to the release that joint tortfeasors are not released thereby, and (2) that such agreement appear in the release—the affirmative intent of the parties if not expressed in the release would have been irrelevant. Restatement, Torts, § 885(1) (1939).

**40.** Van Slyke v. Van Slyke, 80 N.J.L. 382, 78 A. 179, 31 L.R.A.,N.S., 778 (1910); Billotti v. Accurate Forming Corp., 39 N. J. 184, 188 A.2d 24 (1963), Atlantic Northern Airlines v. Schwimmer, 12 N.J. 293, 96 A.2d 652 (1953).

**41.** It should be noted that here the entire release was introduced by the "whereas" clause stating that the payment of $5,000 is made to "Stanley Novak and Walter L. Svihla, individually and t/a Supreme Tire Service in their claim against Union Carbide Corporation arising out of the sale of Prestone Anti-freeze during the period September 1961 and April 1962. * * * " Certainly, these words describe with particularity the source of the claim the settlement of which gave rise to the release.

**42.** Van Slyke, supra, n. 40, 80 N.J.L. 382, 78 A. at 181–182.

fendant thereafter. (It had been destroyed before plaintiff was able to recover it.) Defendant interposed a release executed by plaintiff in favor of a third party—Alsom, Ltd.—in return for the payment to plaintiff of $300,000 by Alsom's president as full reimbursement for both the use and the loss of the plane. Following a trial without a jury, the Court found, inter alia, that the release discharged defendant even though he was not employed by the releasor nor "acting in its behalf."

Plaintiff appealed, urging as error the admission of evidence alleged to contravene the words of the release designating the release. The Supreme Court affirmed in language clearly in accord with *Van Slyke*, supra.

Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to obtain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. * * * The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purposes. * * " [43]

## IV.

### CONCLUSION

While the federal policy of jealously regarding the rights of private antitrust claimants should not as a matter of law preclude their being able to release claims—even unknown claims—nor protect them, after-the-fact, from their conscious though unwise action, we think it does allow—and is supported by —a rule which requires the court to determine that they *knew and intended* that the release cover all that it is being held to cover.[44] The question of the parties' intent as to the scope of the release is one of fact not readily ascertained on a motion for summary judgment; but which should be determined by the trier of fact after a full hearing. Thus, I must deny the motions of both Carbide and General Electric—since General Electric's motion arises out of the release also. For the same reason, plaintiff's motion must be denied also.

43. Atlantic Northern Airlines v. Schwimmer, 12 N.J. 293, 96 A.2d 652, 656–657 (1953).

44. Mere shorthand references such as "general release" are not in themselves sufficient. Nor do I think that ritualistic incantations such as the italicized portions of the release at pages 20 to 22 supra, are sufficient to deprive one of unknown antitrust claims. It is not too much to require the conspicuous insertion of a phrase stating that the release covers, for example, "all claims, whether presently known, or unknown, suspected or unsuspected, arising out of the same or of different product lines as are here involved and whether related or unrelated to the present dispute as to law or facts or both," before we hold that *as a matter of law*, the parties *must* have intended to cover a prior unknown and unrelated claim.