280 F.3d 175
 TELECOM INTERNATIONAL AMERICA, LTD., Plaintiff-Counter-Defendant-Appellant-Cross-Appellee,
Telecom International Co., Ltd., Counter-Defendant-Cross-Appellee,
v.
AT & T CORP., doing business as AT & T, Defendant-Counter-Claimant-Appellee-Cross-Appellant.
 Docket No. 00-7385.
 United States Court of Appeals, Second Circuit.
 Argued December 7, 2000.
 Decided October 18, 2001.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Aurora Cassirer, Parker Chapin LLP, New York, NY, for Plaintiff-Counter-Defendant-Appellant-Cross-Appellee.
 Alan M. Unger, Sidley & Austin, New York, NY, (Elizabeth M. Sacksteder, of counsel; Sharon A. Gans, AT & T Corp., of counsel), for Defendant-Counter-Claimant-Appellee-Cross-Appellant.
 Before: OAKES, KEARSE, and WINTER, Circuit Judges.
 WINTER, Circuit Judge.
 
 
 1
 Telecom International America ("TIA") appeals from Judge Hellerstein's grant of summary judgment dismissing its contractual, fraud, unfair competition, misappropriation, and Communications Act claims against AT & T Corp. TIA also appeals from the grant of summary judgment to AT & T on its counterclaims against TIA. AT & T cross-appeals from the dismissal of its counterclaim for breach of contract against TIA's corporate parent, Telecom International Co., Ltd. ("TI"), seeking to pierce TIA's corporate veil and obtain satisfaction of the counterclaim judgment from TI.
 
 
 2
 Briefly stated, AT & T, a telecommunications services provider, and TIA, a telephone service reseller, entered into a series of agreements for the purchase of AT & T long-distance services and telecommunications equipment. The purchase of services was governed by a negotiated contract tariff filed with the Federal Communications Commission ("FCC"). The purchase of equipment was pursuant to separate written Purchase/Sale Agreements ("equipment agreements"). Although TIA intended to use the services and equipment in a unified system, the various agreements disclaimed any warranties by AT & T as to performance of such a system and proclaimed each agreement to be a separate, wholly-integrated contract. Furthermore, the equipment agreements capped AT & T's liability for defective equipment at $100,000 and barred the recovery of consequential damages, while the contract tariff exposed TIA to a multi-million dollar liability for failing to meet a minimum calls requirement, even if such failure was caused by defective equipment. However, this arrangement was not as draconian as it seems. TIA was a wholly-owned subsidiary formed by TI specifically for these transactions and was the only signatory to the agreements with AT & T. Because TI supplied TIA with capital only as needed, TIA could not satisfy the penalties in the contract tariff unless the unified system worked, in which case the heavy penalties would prevent TIA from moving to other service providers during the term of the contract.
 
 
 3
 In the event, AT & T's equipment and/or services failed to function well, and the unified system was a failure. After performance difficulties led to disagreements, AT & T threatened to terminate services for nonpayment. In response, TIA commenced this action, alleging that AT & T promised to link equipment and services into a seamless, "end-to-end," unified system. It asserted numerous claims including breach of contract, fraud, unfair competition, and violations of the Communications Act. AT & T counterclaimed against TIA and TI for overdue tariff, equipment maintenance charges, and penalties for failing to meet the minimum calls requirements of the tariff.
 
 
 4
 We enforce the contracts as written. We hold that TIA's evidence of an overarching agreement with warranties as to the performance of a unified system is barred by the parol evidence rule under New Jersey law and the filed tariff doctrine. We affirm the dismissal of TIA's Communication Act claim. We affirm the district court's dismissal of TIA's other claims as either derivative of TIA's contract claim or as not supported by evidence. We also affirm the granting of judgment against TIA on AT & T's counterclaims. Finally, we order that AT & T's veil-piercing claim against TI be dismissed with prejudice.
 
 BACKGROUND
 
 5
 a) Preliminaries
 
 
 6
 Unless otherwise stated, we view the evidence in the light most favorable to the party against whom summary judgment was entered. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
 
 
 7
 TIA's Japanese corporate parent, TI, is a reseller of telecommunications services in Japan. It is the second largest telephone company in Japan and part of a powerful business "kieretsu", known as the Asahi group. AT & T needs no introduction. TI neither owns nor operates any equipment or any network. Instead, it obtains customers for the telephone services of a much larger carrier. TI intended to use the same business model for its planned entry into the Japanese international long-distance market and shopped the American telecommunications market for a suitable partner(s).
 
 
 8
 In particular, TI was looking to introduce a "call-turnaround" system, a method of arbitraging differences in telecommunications rates in different countries. TI's proposed call-turnaround system would first connect a long-distance call originating in Japan to an American switching station over a toll-free line ("outbound call") and then originate a call from the switching station to the intended recipient ("inbound call"). The customer — the original caller — would be charged the lower American rate, thus circumventing higher Japanese rates.
 
 
 9
 In February 1994, after considering other vendors and service providers, TI began negotiations for the purchase of both telecommunications services and switching equipment from AT & T. The proposed call-turnaround system — styled "Diamond Net" — had three distinct components: outbound service, inbound service, and switching equipment. Network services could be purchased from either AT & T or other long-distance telephone carriers. Moreover, outbound services and inbound services could be purchased from different carriers. The switching equipment could also be purchased or leased from either AT & T or other vendors. No technological reason compelled the purchase of all components from the same source, that is, three different sources could provide inbound service, outbound service, and switching equipment respectively, albeit some party would have to perform a coordinating function.
 
 
 10
 AT & T's sales pitch included representations that there were benefits in an "all AT & T" solution. AT & T apparently made some optimistic technical representations as well, concerning the speed and reliability of AT & T equipment. In March 1994, AT & T presented TI with a written proposal that trumpeted AT & T's "efficiency of end-to-end service, optimized voice and data networking and a single point of contact for questions and trouble resolution." The proposal asserted, inter alia, that "AT & T Bell Laboratories is the finest R & D center in the world," "Value = AT & T," and "AT & T was voted number one for the best technology in a consumer survey." A person at AT & T professed the company's experience with systems "similar" to that desired by TI.
 
 
 11
 Before signing any contracts with AT & T, TI formed a wholly-owned subsidiary, TIA, incorporated in New York, as the designated operator of Diamond Net and contractual partner with AT & T. TIA was staffed by two American-based executives with decades of telecommunications experience. In the early stages of TIA's existence, TI paid TIA's startup costs and operating expenses, including equipment and service purchases, office rent, and personnel salaries. At the same time, TI did not compensate TIA for the wholesaler services that TIA supplied to TI. It provided capital to TIA only as TIA had a current need for expenditures.
 
 
 12
 After receiving the proposal from AT & T, TIA agreed with AT & T to purchase the following services and equipment: (i) outbound call services from Japan to the New York switching station; (ii) inbound call services from the switching station to the ultimate destination; (iii) a customized switch to bridge the outbound and inbound calls; (iv) an automated voice response system to couple the outbound and inbound calls; and (v) a connecting cable. Following AT & T's recommendation, TIA also contracted with AT & T-affiliated companies for the writing of the necessary software and the housing of TIA's switching equipment. These arrangements followed TI's customary business model of outsourcing technical and support activities.
 
 
 13
 On April 29, 1994, two weeks after TIA's incorporation, the parties signed two agreements: (i) the Contract Tariff Order ("CTO") for the purchase of outbound and inbound network services, and (ii) an equipment agreement, for the purchase of various pieces of equipment and software, as well as post-warranty maintenance services. TIA's corporate parent, TI, was not a party to, or mentioned in, any of the agreements. We now turn to the terms of the various agreements.
 
 
 14
 The CTO specified the services to be provided by AT & T, along with prices, warranty disclaimers, and other conditions. Among the terms were shortfall penalty provisions that committed TIA to purchase a substantial minimum amount of both outbound and inbound services during the three-year term of the agreement. The shortfall penalty provisions charged separately for unused outbound and inbound services.[1] This arrangement imposed separate penalties for a lack of customers in great numbers and for a lack of customers making long calls.[2] The size of the penalties also effectively prevented TIA from switching to another telecom service provider for either outbound or inbound services during the three-year term.
 
 
 15
 The CTO also contained a Business Downturn Clause specifying a broad range of conditions under which TIA might be released from its minimum volume commitments. To trigger the Business Downturn Clause, both parties had to agree to a mutually acceptable solution, file tariff amendments with the FCC, and follow various regulatory requirements.
 
 
 16
 During the negotiations, TIA expressed concerns to AT & T about the minimum volume commitments. In response, AT & T allegedly represented that shortfall penalties were no more than pro forma regulatory requirements dictated by the FCC, that the Business Downturn Clause fully protected customers from such charges, and finally, that AT & T had never enforced shortfall penalties against a customer and would not do so against TIA. None of these representations by AT & T was ever reduced to writing, much less embodied in the CTO.
 
 
 17
 On May 18, 1994, AT & T filed with the FCC Contract Tariff 1192 ("CT 1192"), which was required to implement the CTO and which embodied its terms. CT 1192 listed the same prices, volume commitments, and other details as the CTO, and incorporated by reference the Terms and Conditions from the standard tariff form that was used for the CTO.
 
 
 18
 Neither the CTO nor CT 1192 contained any references to equipment or to a unified call-turnaround system. In fact, AT & T's general tariffs, incorporated by reference in CT 1192, expressly provided that AT & T "is not responsible for the quality of transmission or signaling on the Customer's side of the interface at a Customer's premises." Furthermore, the CTO contained a conspicuous disclaimer of all warranties, as well as an integration clause proclaiming that the document was the entire agreement of the parties.
 
 
 19
 The first equipment agreement was signed on April 29, 1994. It governed TIA's purchase of various equipment, software, and post-warranty services. Because AT & T was to provide financing and had access to TIA financial information, TIA's lack of capitalization generated concern on the part of AT & T Credit Corporation ("ATTCC"), AT & T's subsidiary responsible for the financing. As a result, ATTCC requested a standby letter of credit to secure TIA's obligations. However, this request was refused, and ATTCC eventually accepted a deal requiring a downpayment of $200,000, roughly equal to AT & T's cost of manufacturing the equipment.
 
 
 20
 The equipment agreement contained the following disclaimer, in capital letters:
 
 
 21
 EXCEPT AS STATED IN SECTIONS 6 AND 7, AT & T, ITS SUBSIDIARIES AND THEIR AFFILIATES, SUBCONTRACTORS AND SUPPLIERS MAKE NO WARRANTIES, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIM ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.
 
 
 22
 The Terms and Conditions of the equipment agreement also provided, in capital letters, that "AT & T SHALL NOT BE LIABLE FOR INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR FOR LOST PROFITS, SAVINGS OR REVENUES OF ANY KIND" and limited TIA's remedies for breach of warranty to repair or replacement of the nonconforming product. Any recovery in damages for equipment failure was limited to $100,000. Finally, the Terms and Conditions of the equipment agreement contained a conspicuous and capitalized integration clause:
 
 
 23
 THIS IS THE ENTIRE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE PRODUCTS AND SERVICES PROVIDED HEREUNDER AND SUPERSEDES ALL PRIOR AGREEMENTS, PROPOSALS, COMMUNICATIONS BETWEEN THE PARTIES AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL.
 
 
 24
 The agreement specified that it was to be governed by the law of New Jersey.
 
 
 25
 Soon after installation, the equipment exhibited multiple deficiencies inconsistent not only with AT & T's representations of quality, but also with AT & T's standard specifications. When TIA complained, AT & T organized a group of engineers, styled the "Tier Three Task Force," to investigate. The Tier Three Task Force eventually concluded that Diamond Net had failed in a number of unidentified ways and was therefore potentially unfixable, albeit there was still hope that a workable "alternative" would be found. The pessimistic conclusions of the Task Force were not disclosed to TIA, and there is some evidence that senior AT & T technicians recommended concealment of the seriousness of the problems from TIA because of the size of its contracts with AT & T. The size referred to — "$50M commit" — involved the contracts for services, not the equipment sales.
 
 
 26
 Some of the Task Force members also participated in a research team charged with designing AT & T's own call-turn-around system.[3] Eventually, AT & T launched such a call-turnaround service, including service in Japan. Although the structure of AT & T's system was different from that of TIA's, it is undisputed that the lessons learned from Diamond Net might have aided AT & T in designing its own system, if only in avoiding mistakes. None of AT & T's contracts with TIA contained non-competition or confidentiality provisions regarding AT & T's research and development efforts relating to Diamond Net.
 
 
 27
 In late June 1995, amid its private doubts as to whether Diamond Net was reparable, AT & T recommended to TIA that it purchase additional equipment and software upgrades to correct the problems. For these sales, the parties entered into a second equipment agreement. ATTCC agreed to provide full financing for the second equipment purchase, keeping title to the equipment until the purchase price had been paid.[4]
 
 
 28
 TI again provided no financial guarantees. By the time of the signing of the second equipment agreement, the relationship between TIA and TI had been restructured as an arms-length wholesaler-retailer relationship, formalized in a Master Distributorship Agreement signed by TIA and TI on January 1, 1995.[5]
 
 
 29
 The second equipment agreement contained, again in capital letters, the same disclaimers and limitations as the first equipment agreement. AT & T disavowed any warranty not expressly contained in the agreement as well any warranty of merchantability or fitness. The second agreement also limited AT & T's liability to repair or replace any nonconforming product and capped AT & T's damages liability at $100,000. Finally, the second agreement included the same integration clause as the first agreement and similarly stated that it was to be governed by New Jersey law.
 
 
 30
 The new equipment did not solve Diamond Net's problems. In June 1995, TIA and AT & T senior executives exchanged letters concerning the problems of Diamond Net and possible invocation of the Business Downturn Clause. To invoke the Business Downturn Clause, the parties had to "cooperate in efforts to develop a mutually agreeable alternative" that would be implemented as "tariff revisions" to be filed with the FCC. The parties never reached a definitive agreement, and AT & T did not file the tariff revisions. However, AT & T did not bill TIA for shortfall penalties and reassured TIA that it would not seek to enforce the shortfall provisions.
 
 
 31
 b) The Lawsuit
 
 
 32
 On February 20, 1996, TIA filed the present action in New York state court. AT & T removed the action to the district court, asserting federal question jurisdiction under the Communications Act and thereafter answered the complaint and counterclaimed, including a claim for shortfall penalties. It also joined TI as a counterclaim defendant. After discovery and various amendments to the complaint and counterclaims, AT & T moved for summary judgment, which the district court granted in part and denied in part.
 
 
 33
 The court rejected TIA's contract and warranty claims because of the New Jersey parol evidence rule and the filed tariff doctrine. It did not dismiss TIA's claim for breach of the standard specifications incorporated in the equipment agreements, holding that a genuine dispute of material fact existed. The court dismissed TIA's claims for fraudulent inducement and negligent misrepresentation as derivative of the breach of contract claims and as barred by the filed tariff doctrine. The court dismissed TIA's quasi-contract claims because there were enforceable contracts governing the same subject matter. TIA's mistake claims were dismissed under the parol evidence rule and for lack of evidence of any mistake by AT & T. The district court dismissed TIA's three claims for unfair competition asserted under federal common law, the Lanham Act, and New York state common law. These claims were based on the fact that AT & T's new call-turnaround system competed with the failed Diamond Net. The court first held that there is no federal common law of unfair competition. Second, it held that the Lanham Act claim required TIA to show customer confusion or deception as to the origin of AT & T's own products competing with TIA's failed system. The district court found that TIA made no such showing. Finally, the district court dismissed TIA's New York common-law claim for the same lack of customer confusion.
 
 
 34
 TIA also asserted two claims under the Communications Act: unlawful discrimination under Section 202(a) in that Diamond Net calls were disproportionately routed by the unsatisfactory satellite method instead of by cable, and unreasonable practices involving the misappropriation of TIA proprietary network information under Section 201(b). The district court dismissed the discrimination claim for lack of a genuine dispute of material fact. It also dismissed the unreasonable practices claim because TIA did not show that any information was either proprietary or actually misappropriated. The court did, however, find that there was a genuine issue of fact as to the accuracy of AT & T's bills.
 
 
 35
 As to AT & T's counterclaims, the district court held that the filed tariff doctrine barred TIA from raising any common law defenses, and that TIA was liable in accordance with the written terms of CT 1192. The district court granted summary judgment for AT & T's counterclaims for shortfall penalties and overdue usage charges, but reserved the calculation of damages for trial. As to the reasonableness of shortfall charges, the district court declined to second-guess their reasonableness because of the filed tariff doctrine and, because TIA specifically declined to take its unreasonableness claim to the FCC, granted summary judgment for AT & T.
 
 
 36
 The court also granted summary judgment for AT & T on its equipment maintenance claim, remarking that TIA did not dispute this claim. The district court sua sponte dismissed AT & T's counterclaims against TIA's parent, TI, on the ground that AT & T failed to proffer any facts that TI "controls and dominates TIA."
 
 
 37
 The district court's summary judgment decision left three issues for trial: (i) TIA's claim for breach of the standard specifications; (ii) TIA's claim for delayed and inaccurate billing; and (iii) the amount of AT & T's damages on its counterclaims for tariffed charges. Thereafter, the court granted AT & T's motion in limine to exclude evidence of lost profits on TIA's surviving breach of contract claim because the equipment agreements expressly barred any liability for lost profits.
 
 
 38
 While AT & T's motion for summary judgment was pending, TIA cross-moved for discovery under Fed.R.Civ.P. 56(f), alleging that it had been deprived of critical documents. TIA contended that AT & T had withheld certain reports establishing that an unusually high percentage of TIA's calls were routed by satellite, rather than by the more effective cable method, in violation of the Communications Act. The court directed AT & T to produce such reports for a three-month period, but AT & T informed the court that the documents had been destroyed in the ordinary course of business, although after TIA had requested their production in discovery. TIA moved pursuant to Fed.R.Civ.P. 37(b) to dismiss AT & T's counterclaims and strike AT & T's answer. Alternatively, TIA sought the reinstatement of its discrimination claim and a direction that discrimination be found based on AT & T's spoliation of evidence. AT & T argued that the deleted data could not have supported TIA's discrimination claim because the routing of TIA's calls was done automatically by equipment that used neutral criteria for all customers. TIA disputed this. Eventually, AT & T produced about ten percent of the requested reports, which had been salvaged from the files of employees. The court held a three-day hearing, at which AT & T presented a statistical expert who concluded that the size of the preserved sample was sufficient to draw statistically significant inferences and opined that only a small fraction of Diamond Net's calls had been transmitted by satellite. The court found that AT & T had not acted willfully or in bad faith and held that no adverse inference would be drawn against AT & T. It therefore declined to reinstate TIA's discrimination claim.
 
 
 39
 By Stipulation and Order dated February 24, 2000, TIA and AT & T resolved all remaining claims between them. TIA consented to the dismissal with prejudice of its surviving claims, while reserving the right to appeal from the summary judgment decision and the lost profits order. The parties also stipulated to the amount of AT & T's damages on AT & T's counterclaims, but TIA reserved the right to appeal from the liability rulings on those counterclaims.
 
 
 40
 AT & T asked for reconsideration of its veil-piercing counterclaim against TI on the ground that there had been no discovery on that matter. The district court thereafter revised its dismissal so that it was without prejudice, on the grounds that AT & T bore a "heavy burden" in meeting the conditions for veil-piercing and that pursuit of these claims would be an undesirable "digression" preventing the final resolution of the other issues in the case.
 
 
 41
 All claims against all parties having been disposed of, this appeal and cross-appeal followed.
 
 DISCUSSION
 
 42
 a) Breach of Contract
 
 1. Overview
 
 43
 This appeal and cross-appeal involve several writings carefully negotiated by corporate giants with resources that gave them access to the finest legal and technical support the planet had to offer. They now argue that each has been misled by the other to sign documents that did not reflect their true intent. Each seeks judicial relief from the unconscionable conduct of the other.
 
 
 44
 TIA is owned by the second-largest Japanese telephone company, which itself is affiliated with one of the world's largest business associations, the Asahi group. TIA's American-based executives had decades of telecommunications experience. After shopping for services and equipment in a market in which alternatives were available, TIA signed a series of agreements with an American telecom giant, AT & T.
 
 
 45
 TIA principally claims that it did not agree to several independent agreements rather than a single, end-to-end agreement and that AT & T is liable for unlimited consequential damages because it warranted the operation of the Diamond Net system at a particular level of quality. TIA asserts these claims notwithstanding express language to the contrary in the contracts. TIA also contends that the multi-million dollar shortfall penalties resulting from AT & T's own failure to provide an efficient unified system are unconscionable.
 
 
 46
 But wait! AT & T says that TIA knew all along exactly what it was doing and that AT & T is the real victim. AT & T did not intend to contract solely with TIA, a corporate shell without sufficient capital to meet its contractual obligations. AT & T did not mean to extend credit to, much less expect satisfaction of potential shortfall penalties in the millions of dollars from, an undercapitalized corporate entity that would have significant assets only if the Diamond Net system worked. It meant to contract with TI.
 
 
 47
 Underlying these tales of oppression and betrayal — told by lawyers in a fashion worthy, not of Dickens, but perhaps, save for the lack of a carnal aspect, of afternoon television — is a rather ordinary, reasonable, contractual allocation of risks.
 
 
 48
 The conduct of the parties shows that they believed in the Diamond Net concept but were concerned that implementation was no routine matter. Each party consciously went out of its way to limit its potential losses from failure.
 
 
 49
 TI sought to limit its potential losses by limiting its investment. It wanted to operate Diamond Net by contracting for the use of services and products operated, maintained, and financed entirely by others. TI also wanted to limit its legal exposure and did business with AT & T exclusively through TIA, which was provided funds only as needed and never retained significant assets. TIA considered obtaining equipment and services from potential providers other than AT & T. It decided to do business with AT & T in part because TIA preferred the technical and other assistance offered by AT & T and needed to make Diamond Net successful. AT & T could be expected to provide such assistance because AT & T's potential profit was in selling outbound and inbound services to TIA. To be sure, AT & T also sold equipment to TIA, but the equipment price was not only relatively modest but was also significantly financed by an AT & T subsidiary in a credit transaction with the undercapitalized TIA.
 
 
 50
 For its part, AT & T insisted upon contracts that unmistakably treated each transaction as separate from the others, notwithstanding TIA's intentions regarding the creation of a unified system. However, there is no impropriety in a seller insisting on legally separate transactions for the simultaneous sale of several products and services, all of which are available from competitors, and can be used separately, to a customer that intends to use the products and services as a unified system. Parties are free to allocate risks of failure separately in sales of separate, but complementary, goods and services.
 
 
 51
 In such circumstances, the seller wants to maximize its sales of products and services while the buyer wants to construct a unified system. There are risks of failure to be allocated: (i) a product or service may fail to work as expected or (ii) the unified system may not perform well. An allocation of these risks has to be negotiated, the seller usually wanting to guarantee as little as possible and to get its money upfront. The buyer wants a soup-to-nuts warranty with one hundred percent financing.
 
 
 52
 The allocation of the risk of failure here was not, as TIA suggests, unconscionable. The parties essentially split the risk of equipment failure in the first equipment agreement when TIA advanced a $200,000 downpayment to cover AT & T's production costs and agreed to a $100,000 cap on AT & T's liability for equipment failure. The second equipment agreement was fully financed by AT & T, again with limits on AT & T's liability. There is nothing unreasonable here. AT & T did not want to be liable for consequential damages from a failure of the unified system that would be large multiples of the product price — TIA is suing here for tens of millions of dollars — particularly when AT & T was providing much of the financing. This was hardly a bad deal for TIA, whose assets did not even cover the total price of the equipment agreements.
 
 
 53
 TIA portrays the shortfall penalties as unconscionable provisions requiring it to pay millions of dollars in damages to AT & T because the unified system failed to attract customers. However, TIA had no significant assets. Absent a guarantee by TI, therefore, AT & T had no expectation of recovering shortfall penalties from TIA unless Diamond Net was successful. Of course, if Diamond Net was successful, there would be no shortfall — unless, after perfecting the Diamond Net system with AT & T's aid, TIA switched to cheaper outbound and/or inbound services from another provider(s). The shortfall penalties were thus protection for AT & T from the risk of opportunistic behavior by TIA during the three-year term of the agreement. It is no wonder that AT & T assured TIA that it would not enforce the shortfall penalties if Diamond Net failed to attract customers, while perhaps considering it bad form to mention during the courtship period why it nevertheless wanted large shortfall penalties. What AT & T may not have consciously considered was another form of opportunistic behavior. If Diamond Net failed technologically, TIA might seek to see it succeed financially by suing AT & T for tens of millions of dollars in consequential damages notwithstanding the language of the equipment agreements. In those circumstances, shortfall penalties would seem attractive to AT & T as grounds for a counterclaim reducing or eliminating its potential liability to TIA.
 
 
 54
 We therefore see nothing in the contractual agreements that suggests anything but a rational, informed allocation of the risks of equipment failure, system failure, or opportunistic behavior. Essentially, but for TIA's downpayment, AT & T's liability for $100,000 for equipment failure, and some interim charges, the parties agreed to swallow their own out-of-pocket and consequential losses if Diamond Net failed. Indeed, the reasonableness of the deal is underlined by examining the alternatives now offered us by the parties. On the one hand, TIA wants us to treat the bargain as one in which TI, shielded from liability by TIA, makes a $200,000 downpayment, has modest (relative to the damages sought) out-of-pocket expenses, and is guaranteed either tens of millions of dollars in actual profits or tens of millions of dollars in damages for lost profits. On the other hand, AT & T asks us to enforce the shortfall penalties against TI because the equipment it sold to TIA failed. Fortunately, there are no quirks in the law allowing the parties to escape the very reasonable bargain they struck.
 
 2) The Parol Evidence Rule
 
 55
 TIA argues that the district court improperly failed to consider extrinsic evidence in determining whether TIA and AT & T had a single integrated agreement. We disagree.
 
 
 56
 Under New Jersey law, contract terms that are "set forth in a writing intended by the parties as a final expression of their agreements with respect to such terms ... may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented ... by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." N.J. Stat. Ann. § 12A:2-202. New Jersey's parol evidence rule is "unusually rigid." N.J. Stat. Ann. § 12A:2-316 cmt. 5. In Atlantic Northern Airlines v. Schwimmer, 12 N.J. 293, 96 A.2d 652 (1953), the New Jersey Supreme Court stated that parol evidence "is adducible only for the purpose of interpreting the writing — not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant." Id. at 656.
 
 
 57
 In the present case, TIA's extrinsic evidence that a working, unified system was contracted for — based on AT & T's proposal, representations by AT & T executives, and internal correspondence among AT & T employees — would insert contractual terms that are both conspicuously absent from the written agreements and flatly inconsistent with the agreements. Consequently, New Jersey's parol evidence rule bars consideration of that evidence.
 
 
 58
 Alternatively, TIA argues that each of the written contracts was not in itself complete and unambiguous and, thus, the parol evidence rule does not apply. Again, we disagree.
 
 
 59
 First, a line of New Jersey cases holds that an agreement is presumed to be complete unless it is "apparent from the writing itself that something is left out to be supplied by extrinsic evidence." Schlossman's, Inc. v. Radcliffe, 3 N.J. 430, 70 A.2d 493, 495 (1950); see also Ross v. Orr, 3 N.J. 277, 69 A.2d 730, 732 (1949); Filmlife, Inc. v. Mal "Z" Ena, Inc., 251 N.J.Super. 570, 598 A.2d 1234, 1235 (App. Div.1991). As the "Overview" section of this opinion indicates, there is nothing in the agreements that makes it "apparent" that anything was left out. The parties consciously allocated the risks of technological failure, deterred opportunistic behavior, and limited their respective liabilities to each other.
 
 
 60
 Second, under New Jersey law, the presence of an unequivocal and conspicuous integration clause further strengthens the presumption of completeness and is nearly dispositive. See Dow Chem. Co. v. Schaefer Salt & Chem. Co., No. CIV. A. 91-4027, 1992 WL 672289, at *9 (D.N.J. July 21, 1992); United States v. Clementon Sewerage Auth., 365 F.2d 609, 614 n. 1 (3d Cir.1966) (New Jersey courts "may give the statement conclusive effect in determining integration" if "the writing contains a statement to the effect that it is the complete and final statement of the agreement"); Zone Co. v. Serv. Transp. Co., 137 N.J.L. 112, 57 A.2d 562, 564-65 (1948). Finally, the presumption of completeness is particularly strong where sophisticated parties have conducted extensive negotiations prior to entering into the agreement. See Sierra Diesel Injection Serv., Inc. v. Burroughs Corp., 890 F.2d 108, 112 (9th Cir.1989) (under New Jersey law existence of merger provision not dispositive when "the contract is a pre-printed form drawn by a sophisticated seller and presented to the buyer without any real negotiation").
 
 
 61
 Our conclusion is not altered by a line of New Jersey cases holding that contractual completeness must be determined by the intent of parties, even where the contract has an integration clause. In Atlantic Northern Airlines, for example, the Supreme Court of New Jersey held that "[e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement." 96 A.2d at 656; see also S. Megga Telecomms. Ltd. v. Lucent Techs., Inc., No. 96-357-SLR, 1997 WL 86413, at *5 (D.Del. Feb.14, 1997) (interpreting Atlantic Northern Airlines to mean that extrinsic evidence can be considered to determine the scope and meaning of a written agreement, even where written agreement is not ambiguous and contains integration clause); L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc., 9 F.3d 561, 569 (7th Cir.1993) (applying New Jersey law, "[i]f the allegedly integrated writing does not, without reference to another document ... reveal what the basic transaction entailed, then the writing is not integrated").
 
 
 62
 Our conclusion stands, however, because, as our earlier discussion demonstrates, the parties intended the bargain described in the writings. AT & T wanted to limit its damages for the failure of the unified system and the risk of TIA seeking a cheaper service provider(s) once Diamond Net was up and running successfully. TI wanted to risk only its investment in Diamond Net, and it therefore created the undercapitalized TIA as the sole entity in a contractual relationship with AT & T.
 
 
 63
 TIA's proffer of evidence — again, AT & T's Proposal, oral representations of AT & T executives, and internal communications of AT & T employees — is helpful only in determining what TIA wanted to buy, not in determining how the parties agreed to allocate the risks of failure in their contracts. Certainly, there is nothing in the record — nothing — to suggest a deal in which TI, shielded from any significant financial exposure by the existence of TIA, makes a relatively modest investment of its own, gets equipment financing from AT & T, and is guaranteed tens of millions of dollars either in actual profits or in damages for lost profits. Thus, even considering the extrinsic evidence, the result is the same. TIA has not shown that the written contracts were incomplete.
 
 
 64
 TIA relies heavily upon the Seventh Circuit's decision in Heath. In that case, AT & T provided Heath with a "Recommendation and Proposal" regarding an integrated processing system. Based on these representations, Heath signed a two-page "Master Agreement," which failed to identify prices, products, services, software, or other information, but did include a merger clause." See id. at 565-69. The Master Agreement also stated that it would cover all unspecified future purchases. See id. at 565. The parties ultimately signed six amendments for specific new purchases. Because the Master Agreement did not contain essential elements such as the price and quantity of the goods to be purchased, the Master Agreement was not deemed complete by the court. See id. at 569-70. Also, the court was unable to determine whether the Master Agreement together with the six amendments and/or "Recommendation and Proposal" constituted a complete agreement because the Master Agreement never specified which other documents were to be counted as a part of the "entire agreement." See id. at 569 n. 5. Consequently, the court left the issue of defining the boundaries of the "entire agreement" for the trier of fact. See id. at 570.
 
 
 65
 In the present case, however, the equipment agreements each unambiguously sets the boundaries of what constitutes the "entire agreement." Moreover, Heath is a Seventh Circuit decision interpreting New Jersey law and is not binding upon us. In particular — although we might, or might not, have reached the same result on the facts there — we are concerned with language in that opinion that may confuse the ultimate product wanted by the buyer — a working, unified system — with the parties' agreement as to allocating risks of failure. At times, the Heath opinion seems to suggest that a seller may never limit its liability for failure by insisting on separate agreements and disclaiming warranties of performance when the buyer wants to combine products and services into a working, unified system. Id. at 569 ("If the allegedly integrated writing does not, without reference to another document or other coordinating information, reveal what the basic transaction entailed, then the writing is not integrated."). We see nothing in New Jersey law forbidding negotiated allocations of risk that limit a seller's liability for the failure of the ultimate unified product desired by the buyer.
 
 
 66
 TIA also relies upon AT & T's post-signing conduct — for example, AT & T's extensive efforts to perfect a working unified system — as evidence of a "course of dealing" that clarified the parties' intent. Under N.J. Stat. Ann. section 12A:2-202, even if a writing is a complete and exclusive statement of the terms of the agreement, it can be clarified, but not contradicted, by a course of dealing, usage of trade, or course of performance. See B.F. Hirsch v. Enright Refining Co., 577 F.Supp. 339, 345 (D.N.J.1983), rev'd on other grounds, 751 F.2d 628 (1984); Ace Stone, Inc. v. Township of Wayne, 47 N.J. 431, 221 A.2d 515, 520 (1966). We see no inference favorable to TIA that can be drawn from AT & T's post-contract behavior. If the desired inference is that an integrated transaction with a warranty as to the operation of Diamond Net was intended, it would contradict the actual terms of the written contracts and override the written allocation of risks agreed to by the parties. As is the case with AT & T's pre-signing representations, its post-signing efforts to repair the system may well have shown that the parties intended to create a unified system, but they do not clarify how the parties intended to distribute the risks of failure.
 
 
 67
 We therefore agree with the district court that the parol evidence rule precludes TIA's breach of contract claim with regard to the equipment contracts.
 
 3) Filed Tariff Doctrine
 
 68
 While the parol evidence rule bars us from considering extrinsic evidence contradicting the two equipment purchase agreements, the filed tariff doctrine prevents us from considering similar evidence contradicting the service agreement, CT 1192. The filed tariff doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." Ark. La. Gas Co. v. Hall, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). For purposes of the filed rate doctrine, discounted rates are not the only discriminatory and illegal "privileges." See AT & T v. Cent. Office Tel., Inc., 524 U.S. 214, 224, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). A preference, a rebate, an expedited service, or an unusually detailed agreement, have all been held unenforceable or violative of the filed tariff doctrine. See United States v. Wabash R. Co., 321 U.S. 403, 412-13, 64 S.Ct. 752, 88 L.Ed. 827 (1944); Davis v. Cornwell, 264 U.S. 560, 562, 44 S.Ct. 410, 68 L.Ed. 848 (1924); Chicago & Alton R. Co. v. Kirby, 225 U.S. 155, 165-66, 32 S.Ct. 648, 56 L.Ed. 1033 (1912).
 
 
 69
 In the present case, the tariffs filed by AT & T do not provide for end-to-end service that would link outbound and inbound calls as a part of a working Diamond Net. In fact, when the agreements were negotiated, AT & T did not have any tariffed network service offering under which AT & T had responsibility for the entire transmission path of a call. Neither the CTO nor CT 1192 makes any references to the equipment, the manner in which the network services will operate in conjunction with the telephone switching equipment, the linkage of outbound and inbound services, or the use of network services in a call-turnaround application. To the contrary, the tariffs address the performance of each outbound and inbound call separately and expressly disclaim any responsibility for customer premises equipment involved in transmission or for other inter-related services provided by AT & T.
 
 
 70
 So long as the tariffs were not breached, and TIA does not argue that they were, there was no legally enforceable promise that AT & T failed to fulfill. A hypothetical promise of an end-to-end, unified system would in fact have been an unlawful preference. See Central Office, 524 U.S. at 224, 118 S.Ct. 1956.
 
 
 71
 We therefore agree with the district court that CT 1192 is enforceable as written.
 
 
 72
 b) Breach of Warranty Claims
 
 1) Express Warranty
 
 73
 TIA argues that the warranty disclaimers, although prominently placed in both equipment agreements, were inoperative because they were inconsistent with express warranties given to TIA by AT & T. Among the express warranties claimed by TIA are: end-to-end service, a high rate of call completion, and equipment sufficiently reliable and high-speed for TIA's purposes. However, the warranty disclaimers were valid.
 
 
 74
 Under N.J. Stat. Ann. section 12A:2-313(1), "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Any statement may constitute a warranty, even when unintended as such by the seller, so long as it can "fairly be understood, regardless of [the seller's] intent, to constitute an affirmation or representation that the [goods] possessed a certain quality and capacity relating to future performance." Gladden v. Cadillac Motor Car Div., General Motors Corp., 83 N.J. 320, 416 A.2d 394, 397 (1980).
 
 
 75
 However, the creation of an express but unintended warranty applies only to statements that are not excluded by the parol evidence rule. See Sierra Diesel Injection Serv., Inc. v. Burroughs Corp., 890 F.2d 108, 112-13 (9th Cir.1989) (determining first that form contracts did not represent entire agreement, despite merger clause, and that representations outside main document were part of agreement; only then holding that disclaimer of warranty was ineffective to void express warranties in other document).
 
 
 76
 TIA again relies on Heath, and again its reliance is misplaced. As noted, Heath held that the disclaimer contained in the main agreement was overridden by express warranties in another document supplied by the seller. However, before arriving at that conclusion, the court in Heath first determined that the document containing the disclaimer was not a wholly integrated agreement. 9 F.3d at 570. In the present case, for reasons stated, we have reached a different conclusion as to the existence of independent, wholly integrated agreements.
 
 
 77
 Accordingly, we affirm the decision of the district court as to the TIA's express warranty claim.
 
 2) Implied Warranty of Merchantability
 
 78
 Under New Jersey law, the implied warranty of merchantability may be disclaimed if the word "merchantability" is conspicuously placed in the written document. See N.J. Stat. Ann. § 12A:2-316(2); Gindy Mfg. Corp. v. Cardinale Trucking Corp., 111 N.J.Super. 383, 268 A.2d 345, 349-50 (1970). Section 8 of the Terms and Conditions of the equipment agreement conforms to this requirement. Therefore, the disclaimer of implied warranties of merchantability is valid.
 
 
 79
 c) Enforceability of the Limits on Remedies and Damages
 
 
 80
 As noted, the equipment agreements limit AT & T's damages for equipment failure to $100,000 and exclude recovery for consequential damages. TIA argues that this combination leads to the result that the remedies provided fail of their essential purpose and are unconscionable, rendering the various limits unenforceable.
 
 
 81
 Under the UCC, limitations of remedies are not allowed if "circumstances cause an exclusive or limited remedy to fail of its essential purpose." N.J. Stat. Ann. § 12A:2-719(1), (2). TIA claims that the limited remedies in the equipment agreements failed of their essential purpose because the design of the Diamond Net system was irreparable. However, given that, for reasons already stated, the parties had no end-to-end agreement because of the negotiated allocation of the risk of failure, there was no "essential purpose" left unremedied by the equipment agreements.
 
 
 82
 TIA also argues that the exclusion of consequential damages is unconscionable under UCC. See N.J. Stat. Ann. § 12A:2-719(3). Unconscionability is an issue of law. See N.J. Stat. Ann. § 12A:2-302(1). Under New Jersey law, unconscionability must be shown by "an absence of meaningful choice on the part of one of the parties together with contract terms that are unreasonably favorable to the other party." Abel Holding Co. v. Am. Dist. Tel. Co., 138 N.J.Super. 137, 350 A.2d 292, 304 (Law Div.1975), aff'd, 147 N.J.Super. 263, 371 A.2d 111 (App.Div.1977). TIA argues that it satisfied both prongs of the Abel Holding test, as well as a host of other criteria used in determining unconscionability.
 
 
 83
 However, TIA had a meaningful choice because it undisputably could have purchased similar equipment and similar services elsewhere. Indeed, it considered doing so. TIA did not even have to buy outbound and inbound services from the same provider. There was no relative disparity in the parties' bargaining power, no difference in the parties' relative sophistication, no surprise in the inclusion of the challenged clause, and none of the other elements that traditionally determine unconscionability. See Kaplan v. RCA Corp., 783 F.2d 463, 467 (4th Cir.1986) (applying New Jersey law and listing various determinants of unconscionability); Abel Holding, 350 A.2d at 303.
 
 
 84
 TIA claims that the choice of another equipment vendor was not a meaningful one because AT & T was the only conglomerate company offering a unified service-and-equipment package. However, it is precisely such a package that AT & T refused to offer in its insistence on separate agreements. It is undisputed that there were other suppliers of each component, and TIA has not shown that it could not have contracted for coordinating services with a supplier or third party. It has not even shown that AT & T would not have accepted such a role or that AT & T insisted on being the sole provider.
 
 
 85
 d) Fraudulent Inducement and Negligent Misrepresentation
 
 
 86
 TIA's claims of fraud and negligent misrepresentation relate both to services and equipment. Each claim fails because of the filed tariff doctrine and the parol evidence rule, respectively.
 
 
 87
 Under the filed tariff doctrine, "even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." Central Office, 524 U.S. at 222, 118 S.Ct. 1956. As discussed above, Central Office defines "rate" broadly to include both monetary and non-monetary terms of a contract, including the quality and the type of services. Id. at 224, 118 S.Ct. 1956. To the extent that TIA's fraud claims concern performance of the unified system, they are therefore barred, whether or not TIA is able to show the traditional elements of fraud or negligence. "The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922).
 
 
 88
 The equipment agreements do not involve filed tariffs. Instead, New York state law applies.[6] TIA relies upon Channel Master Corp. v. Aluminium Ltd. Sales, Inc., 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 835 (1958), and Sabo v. Delman, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906, 908 (1957), as standing for the proposition that a contracting party can be liable for fraud if, at the time of the promise, the party did not intend to keep it. There is, however, nothing in the record indicating that AT & T made any promises that it intended at the time to breach. To the contrary, AT & T's only hope for significant profit out of its relationship with TIA lay in Diamond Net's success. The conclusion that AT & T intended to keep its promises includes the promise not to enforce the shortfall penalties. The claim for such penalties came — and understandably so — only after TIA sought in the present action to evade the bargain struck by seeking tens of millions of dollars in consequential damages. In addition, AT & T's continuous efforts to fix the system, its provision of complete financing for the second equipment agreement, as well as the failure to demand the shortfall penalties before this litigation was commenced, indicate that AT & T intended to honor its promises when it made them.
 
 
 89
 Moreover, under New York law, "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." Sudul v. Computer Outsourcing Servs., 868 F.Supp. 59, 62 (S.D.N.Y.1994). In other words, "simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim." Best Western Int'l, Inc. v. CSI Int'l Corp., No. 94 CIV. 0360(LMM), 1994 WL 465905, at *4 (S.D.N.Y. Aug.23, 1994); see also Spellman v. Columbia Manicure Mfg. Co., 111 A.D.2d 320, 489 N.Y.S.2d 304, 307-08 (1985); Wegman v. Dairylea Co-op., Inc., 50 A.D.2d 108, 376 N.Y.S.2d 728, 734-35 (1975). TIA's fraudulent inducement claim therefore also fails because it is simply a breach of contract claim in the tort clothing of (factually unsupported) allegations of an intent to breach.
 
 
 90
 TIA finally argues that its fraud claim is viable because it is based on misrepresentations that were collateral to the contract and induced TIA to enter into the contract. See Four Star Capital Corp. v. Nynex Corp., 183 F.R.D. 91, 109 (S.D.N.Y. 1997); Blank v. Baronowski, 959 F.Supp. 172, 180 (S.D.N.Y.1997).
 
 
 91
 However, apart from harmless self-praise, TIA's sole evidence of a misrepresentation of fact is that an AT & T representative allegedly professed at the time of the deal that the company had had experience with systems "similar" to that desired by TIA, while two different AT & T technical people in their depositions professed ignorance of other "configurations" like that of Diamond Net. Even with the very considerable stretch of an assumption that this evidence amounts to proof of a misstatement of fact, there is no basis for a claim of reasonable reliance. TIA's executives were knowledgeable and experienced in telecommunications and compared alternative sources of products and services. No reasonable factfinder could find credible, much less objectively reasonable, TIA's contention that its selection of AT & T turned upon a single generalized representation of experience with "similar" systems without the TIA personnel ever seeking some verifying or clarifying detail. "Similar" is a term of considerable elasticity and would evoke some scrutiny by reasonable and knowledgeable persons before placing reliance on it.
 
 
 92
 e) TIA's Unfair Competition Claim
 
 
 93
 TIA argues that AT & T violated the federal Lanham Act and the New York law of unfair competition by misappropriating the result of TIA's expenditures, labor, and skill. The district court held that both the Lanham Act and New York common law require a showing — clearly not made — that AT & T attempted to confuse consumers as to the origin of the goods and therefore dismissed both the Lanham Act and state claims. See Telecom Int'l Am., Ltd. v. AT & T Corp., 67 F.Supp.2d 189, 215 (S.D.N.Y.1999). We believe the district court's view of the law to be overly restrictive but agree on the merits and affirm.
 
 1) TIA's Lanham Act Claim
 
 94
 Section 43(a) of the Lanham Act provides two bases for liability: (i) false representations concerning the origin, association, or endorsement of goods or services through wrongful use of another's distinctive mark or other device ("false association"), and (ii) false representations in advertising concerning the qualities of goods and services ("false advertising"). See 15 U.S.C. § 1125(a). The district court addressed only the first basis for Lanham Act liability holding that consumer confusion as to origin is required. Nevertheless, we affirm because TIA submitted no evidence to support either a false association or false advertising claim.
 
 
 95
 As to false association, there is of course no evidence that AT & T misrepresented the origin of its own international call-turnaround services or attempted to associate its services with those of TIA. As to false advertising, TIA did not show that AT & T's misrepresentations caused competitive injury to TIA. "[T]o have standing for a [Lanham Act] false advertising claim, the plaintiff must be a competitor of the defendant and allege a competitive injury." Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 873 (10th Cir.1995); see also Heath, 9 F.3d at 575; Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1109 (9th Cir.1992). Because AT & T's alleged misrepresentations were made in its role as an equipment and service provider to a reseller, rather than in its later-acquired role of a call-turn-around provider to ultimate consumers, AT & T and TIA were not competitors when the alleged false statements were made. Therefore, TIA does not have standing to raise the false advertising claim under the Lanham Act.
 
 2) The New York Unfair Competition Claim
 
 96
 The district court dismissed TIA's common law unfair competition claim based on New York law because of a lack of showing of confusion or deception as to origin. See Telecom, 67 F.Supp.2d at 215. We again disagree with the district court's analysis of law but affirm.
 
 
 97
 "The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." Katz Dochrermann & Epstein, Inc. v. Home Box Office, No. 97 CIV. 7763(TPG), 1999 WL 179603, at *4 (S.D.N.Y. Mar.31, 1999); see also Werlin v. Reader's Digest Assoc., Inc., 528 F.Supp. 451, 464 (S.D.N.Y.1981); Dior v. Milton, 9 Misc.2d 425, 155 N.Y.S.2d 443, 451 (Spec. Term 1956), aff'd, 2 A.D.2d 878, 156 N.Y.S.2d 996 (1956) ("There is no complete list of the activities which constitute unfair competition. The general principle, however, evolved from all of the cases is that commercial unfairness will be restrained when it appears that there has been a misappropriation, for the commercial advantage of one person, of a benefit or property right belonging to another."); Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co., 3 A.D.2d 227, 159 N.Y.S.2d 606, 609-10 (1957) ("Unfair competition is a form of unlawful business injury.... The incalculable variety of illegal commercial practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put to use.").
 
 
 98
 In sum, New York's law of unfair competition is a "broad and flexible doctrine that depends more upon the facts set forth ... than in most causes of action. It has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriati(ng) for the commercial advantage of one person ... a benefit or property right belonging to another." Roy Export Co. Establishment v. CBS, Inc., 672 F.2d 1095, 1105 (2d Cir.1982) (internal citations and quotation marks omitted). An unfair competition claim under New York law is not, therefore, as conceived by the district court, dependent upon a showing of confusion or deception as to the origin of a product or service.
 
 
 99
 TIA's claim is that AT & T misappropriated for its own benefit the product of TIA's expenditures, labor, and skill on Diamond Net. It argues that AT & T used Diamond Net as a "beta test" before entering the Japanese call-turnaround market and that TIA therefore had a proprietary interest in the knowledge and experience gained by AT & T during their relationship. However, there is no evidence that AT & T acted in bad faith and used TIA as a guinea pig only to test ideas with a view to setting up an AT & T-owned system. The record indicates that AT & T expected and hoped that Diamond Net would work and acted in good faith to that end. Indeed, AT & T's efforts to repair Diamond Net were sufficiently extensive to cause TIA to argue that they constituted a course of conduct modifying the equipment contracts. See (a)(2) of the "DISCUSSION" section of this opinion. Although the growing pessimism of AT & T's technicians was not disclosed by AT & T to TIA before the second equipment sale — financed one hundred percent by AT & T — the technicians were largely at a loss as to the source of those flaws, but expressed hopes of correcting them. It is of significance that the failure to disclose the full measure of the engineers' pessimism was related to the size of the contract for services, not the sale of equipment. In other words, even at the time of deepening pessimism, AT & T still hoped to profit from the provision of services to a successful Diamond Net.
 
 
 100
 It may well be that AT & T in the end benefitted from the research and development done on Diamond Net. However, absent some appropriation of an idea or knowledge in which TIA had a property interest or a contractual arrangement creating such an interest, we see no such impropriety here as to call for relief under New York's law of unfair competition.
 
 
 101
 TIA wanted a system that would allow it to profit by selling telephone service in Japan at United States rates. There was nothing in its dealings with AT & T suggesting any legitimate expectation on TIA's part to a property interest in the technology underlying a successful Diamond Net. Had TIA broached a proposal vesting it with such an interest during the negotiations with AT & T, TIA, which was making a minimal investment and limiting its risks, would surely have been rebuffed. Certainly, if Diamond Net had succeeded with great profit to TIA and TIA had then sued to prevent AT & T from providing a similar system to other customers, the action would not have survived a motion to dismiss. The present claim is, if anything, weaker because AT & T learned from its experience with Diamond Net at best only that one kind of call-turnaround system would not work.
 
 
 102
 Nor do we see any impropriety in AT & T using the experience gained for its own benefit. When TI approached AT & T, TI was fully aware that it was dealing with a company that, as part of its business, provided telecommunication services directly to telephone customers. If TIA wanted AT & T to refrain from instituting a call-turnaround system for Japanese customers, TIA should have sought appropriate contractual provisions. AT & T at least should have been informed that part of the cost of doing business with TIA was foreclosing itself from an important market. Had TIA wanted to purchase rights to a market free of competition from AT & T (or from any other AT & T customer) as well as equipment and services, a very different contractual arrangement — actually, no contractual arrangement — would have resulted.
 
 
 103
 f) TIA's Communications Act Claims
 
 
 104
 1) TIA's Claim for Discrimination in Violation of Sections 201 and 202
 
 
 105
 Section 202(a) of the Communications Act makes it unlawful for "any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service." 47 U.S.C. § 202(a). To show discrimination under Section 202(a), TIA must proffer sufficient evidence to allow a trier to find that: (i) the services are "like"; (ii) if so, "the carrier is offering the service to other customers at a `different' price or under `different' conditions than those offered to [TIA]"; and (iii) if such difference exists, it is unreasonable. Am. Message Ctrs. v. FCC, 50 F.3d 35, 40 (D.C.Cir.1995); see also Competitive Telecomms. Ass'n v. FCC, 998 F.2d 1058, 1061 (D.C.Cir.1993).
 
 
 106
 TIA, which bore the burden of proof on the issue, did not proffer sufficient evidence to create a genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). TIA's claim of discrimination is that a disproportionate number of its calls relative to other customers (or AT & T itself) were routed by satellite rather than by cable, the preferable method. The principal evidence offered in support of this claim is a handwritten note by a member of the Tier-Three Task Force, memorializing a conference call. Viewing the evidence in TIA's favor, the note indicated that one party to the conference call stated that records indicated "2/3's of calls [were] on satellite inbound" and that "24 HR [records] [show] high percentage was satellite." As noted, the pertinent records had been destroyed. The district judge held a testimonial hearing on the circumstances surrounding the destruction of the records and found it to have been an innocent act, albeit a violation of AT & T's discovery obligations. Some of the records, or copies of them, had been retained by individual employees in their files. These remaining reports showed that at best ten percent of TIA's calls went by satellite, a quantity not claimed by TIA to be disproportionate.
 
 
 107
 As constituted, the record simply does not contain sufficient evidence to allow a trier to find that TIA's calls were treated differently than calls by other AT & T customers. The handwritten notes are evidence, as their engineer-author testified, only that a sales representative on the conference call had stated that "at some point and for some length of time — I can't define that time — a high percentage was satellite." The notes themselves contain the words "24 HR," and TIA has offered nothing to indicate that a short period of high satellite transmission was either so unusual as to be evidence of a more systematic practice or was discriminatory in that other customers were not subject to similar periods of high satellite usage. We therefore agree with the district court.
 
 
 108
 Also cited (by Appendix page number) as support for TIA's discrimination claim, but not discussed in TIA's brief, is correspondence from TIA to AT & T complaining about an AT & T subcontractor, Kokusai Denshin Denwa Co. ("KDD"). It appears that KDD was involved as a subcontractor in the transmission of Diamond Net calls but was also a competitor of Diamond Net's. TIA complained to AT & T that advertising flyers from KDD to potential customers suggested — but did not state directly — that Diamond Net's calls might involve two satellite transmissions—outbound and inbound — while KDD's calls would never involve more than one such transmission. AT & T presented evidence that the methods of transmission rendered it technologically impossible for KDD to treat one customer differently from another. TIA disagreed and offered contrary evidence that differential treatment was technologically possible.
 
 
 109
 We believe that TIA may have created a genuine issue of fact as to KDD's motive and opportunity to take actions that provided it better service than TIA in KDD's role as an AT & T subcontractor. The only evidence of such actions, however, is an inference drawn from what is essentially advertising puffery by KDD that suggests less satellite transmission for KDD calls to some uncertain degree. That is not enough for a trier to find actual, or at least more than de minimis, differential treatment. Indeed, it is not clear that KDD's advertising flyer would have been admissible.
 
 
 110
 g) TIA's Claims of Unjust and Unreasonable Practice and Misappropriation Under the Communications Act
 
 
 111
 TIA's other claims under the Communications Act are either so without merit or so covered by other portions of this opinion as not to merit further discussion. Accordingly, we affirm their dismissal.
 
 
 112
 h) Summary Judgment for AT & T on Its Counterclaims
 
 
 113
 TIA does not challenge the entry of summary judgment on any of AT & T's counterclaims save for the counterclaim for shortfall charges, which are claimed to be unconscionable. Its arguments in that regard are rejected for reasons stated supra with regard to the reasonableness of the various contracts signed by the parties and the filed tariff doctrine.
 
 
 114
 i) Dismissal of AT & T's Counterclaim Against TI
 
 
 115
 AT & T argues that the district court should not have dismissed its counterclaim seeking to pierce TIA's corporate veil in order to satisfy any judgment through access to TI's assets. In doing so, the court noted that AT & T bore a heavy burden but failed to hold that the burden had not been met. Instead, it dismissed the counterclaim without prejudice to avoid a "digression" that would delay the resolution of the other issues in the case. This was error. A validly asserted claim may not be dismissed on the ground that its resolution would render management of the case more efficient. See Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc., 388 F.2d 272, 285 (2d Cir.1967). The counterclaim was validly filed, and its merits should have been addressed. Nevertheless, we see no reason to remand to the district court for a disposition on the merits.
 
 
 116
 Given our discussion and disposition of the other issues and AT & T's knowledge of TIA's lack of capitalization and its consequences, it is inconceivable that AT & T should be allowed to satisfy its judgment by access to TI's assets. TI wanted to limit its potential losses from the Diamond Net venture to its piecemeal investments, and AT & T knew it. TI therefore created TIA as a separate entity with only as much capital as then-currently needed. There is no evidence that the disclosure to AT & T of TIA's financial condition was anything but full and fair. TI declined to enter into any agreement with AT & T or to guarantee TIA's obligations to AT & T under the agreements TIA signed. AT & T not only knew all this but, after its request for a standby letter of credit had been rejected, negotiated for a downpayment in the first equipment agreement. This negotiation occurred precisely because AT & T knew it could not rely on TIA to pay its bills unless Diamond Net was successful. Moreover, TI would hardly have agreed to the heavy shortfall penalties if its assets were thereby put at risk.
 
 
 117
 Indeed, we view the assertion of a counterclaim for shortfall penalties as proper only as a defensive reaction to TIA's lawsuit, providing some protection from the damages that would flow from TIA's being successful in freeing itself from the limitations on AT & T's liability contained in the various agreements. If the agreements are enforced as written, however, AT & T has no grounds to pierce TIA's corporate veil.
 
 CONCLUSION
 
 118
 We therefore affirm save for ordering that AT & T's claims against TI be dismissed with prejudice.
 
 
 
 Notes:
 
 
 [1]
 In particular, for unused outbound services, TIA had to pay by the minute, an amount roughly equal to the rate per minute specified in an equipment agreement. For unused inbound services, TIA had to pay the difference between the minimum annual charges and the actual billed charges
 
 
 [2]
 TIA vainly attempts to present this arrangement as double-billing. TIA contracted for two separate services — outbound and inbound calls — and it was possible to meet one quota without meeting the other. For example, a large number of very short calls may meet the inbound, but not the outbound, quota, and vice versa for a small number of long calls
 
 
 [3]
 There was evidence that AT & T was considering its own call-turnaround service from the early 1990s and had always viewed TIA as a potential competitor. Notably, CT 1192 contained penalties for generating an excessive number of calls to Hong Kong and China, places where AT & T was planning to make its own call-turnaround offering
 
 
 [4]
 To expedite the sale, AT & T's manufacturing division, which sold the equipment to TIA, provided a letter of credit to ATTCC, which financed approximately twenty-eight percent of the transaction, or a maximum of $100,000. Thus, if TIA failed to pay for its second equipment purchase, one AT & T division would pay another for TIA's default
 
 
 [5]
 Under the Master Distributorship Agreement, TI was appointed as an exclusive distributor of TIA's services in Japan and could not resell in other markets. TI accepted all risks of customer non-payment, as well as all costs of marketing, billing, and personnel expenses in Japan. TI also "reimburse[d]" TIA for the costs of switching equipment, management fees, office rent, and other expenses that TIA incurred in the United States. Finally, TI paid a flat markup of ten percent over TIA's costs for network services. A senior TIA executive claimed this arrangement was established for U.S. tax reasons. It also insulated TI from liabilities incurred by TIA, including the potential multi-million shortfall penalty
 
 
 [6]
 As the district court commented, "[s]ince the conduct which allegedly caused TIA's injury occurred in New York, and TIA suffered its alleged injuries in New York, and since New York contacts seem to be the most applicable, New York law would seem to govern."Telecom, 67 F.Supp.2d at 207 n. 16. We agree.