# United States Court of Appeals
## For the First Circuit

No. 02-1472

SPORTFOLIO PUBLICATIONS, INC. AND ANDREW P. BUCKLEY,

Plaintiffs, Appellants,

v.

AT&T CORP.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf,  U.S. District Judge]

Before

Howard, Circuit Judge,

Bownes and Stahl, Senior Circuit Judges.

Joseph L. Demeo with whom David W. Fanikos and Demeo & Associates, P.C. were on brief for appellants.
James A.G. Hamilton with whom Susan E. Stenger, Thomas T. Reith and Perkins, Smith & Cohen, LLP were on brief for appellee.

February 14, 2003

**BOWNES**, **Senior Circuit Judge**.  This is an appeal by plaintiffs-appellants Sportfolio Publications, Inc. ("Sportfolio") and Andrew P. Buckley, its owner and manager, from a summary judgment issued by the district court in favor of defendant-appellee, AT&T Corporation ("AT&T").[1]  The main issue in this case is whether AT&T improperly withheld monies due to Sportfolio.  To decide this issue, we must interpret a contract between Sportfolio and AT&T.  The parties agree that the contract is to be interpreted under New Jersey law, but disagree as to how that law should be applied to this case.  After examining the contract and the applicable law, we find that AT&T did not improperly withhold money from Sportfolio and affirm the district court's ruling.

## I.  FACTS

There are no essential differences between the parties on the underlying facts.  Since 1989 Sportfolio has provided sports prediction information through pay-per-call 900 number programs.  In September 1989, Sportfolio and AT&T entered into a billing services agreement under which AT&T agreed to perform billing and collection services in connection with Sportfolio's 900 number program.[2]  The agreement provided, in part, that "[y]our customers ('Callers') will be billed for the charges associated with your

---

[1]We treat appellants as one entity, Sportfolio.

[2]The relevant contract provisions are affixed to this opinion as an appendix.

offer(s).  AT&T will remit collected charges to you, less any loss indicated in this agreement."  The agreement also provided that AT&T would undertake "good faith efforts to collect your charges from your callers," less any amount which a "caller disputes or refuses to pay."

The agreement between Sportfolio and AT&T further stated that AT&T's billing mechanism for its 900 number accounts would involve AT&T entering into agreements with local telephone companies, which were referred to as local exchange companies ("LECs").  The LEC would track and bill incoming calls to a given 900 number and arrange for collection from the caller.

The parties also incorporated into their contract the terms of AT&T's Federal Communications Commission tariff.  A clause in that tariff stated that "AT&T MultiQuest Service does not provide for:  . . . calls originating from coin telephones."

Also relevant for this appeal is a section of the contract in which AT&T reserved the right to terminate the contract immediately by notice to Sportfolio if AT&T determined, in its sole discretion, that:  (1) the provision of billing services to Sportfolio adversely affected other AT&T services; (2) Sportfolio's 900 number adversely affected AT&T's public image or goodwill; or (3) an LEC failed to provide necessary billing services at prices acceptable to AT&T.

In September 1989, AT&T contracted with NYNEX as the LEC to provide billing service. Under the AT&T-NYNEX contract, AT&T transmitted to NYNEX records for calls from telephone numbers in the New England states. NYNEX would review the records for "unbillable" calls (e.g., telephone numbers that were no longer in service, or where the owner moved without providing a forwarding address) and then purge such calls from the records. Once unbillable calls were removed, NYNEX would purchase the remaining billable calls from AT&T for a slight discount based on a formula which included a bad debt allowance for "uncollectible" calls (e.g., customer disputes or refusals to pay), and then bill the callers.[3]

From the inception of the AT&T-Sportfolio contract in September 1989 until May 1995, the relationship between the two was uneventful. Sportfolio charged callers $25 per call for accessing the program, from which AT&T deducted a 10 percent fee. AT&T made monthly payments to Sportfolio based on the number of calls to Sportfolio's 900 number during the prior month.

In early June 1995, however, AT&T noticed through routine monitoring that Sportfolio's 900 number was receiving an unusually

---

[3]This procedure is somewhat different from what the district court found -- that the discount took care of unbillable and uncollectible calls. The district court did not mention the winnowing process that NYNEX took prior to its payment to AT&T. This, however, does not affect our reasoning and is immaterial.

high volume of short duration calls from telephone numbers assigned to coin telephones. Although the actual source of the calls was never determined, Sportfolio admitted at oral argument that all the calls came from coin telephones. For the period of June, July and August 1995, over 85,000 short duration calls were placed to Sportfolio's 900 number. In comparison, during February, March and April 1995, call records show that calls to Sportfolio's 900 numbers ranged between four and forty-five calls per month.

By letter dated June 19, 1995, AT&T informed Sportfolio that, pursuant to their agreement, "AT&T will hold . . . $30,500.00 of your June 1995 funds . . . until an investigation of suspicious calls . . . has been completed." When the aberrant calling pattern continued into July and August 1995, AT&T sent similar letters (holding $645,517.53 of July funds and holding $762,764.63 of August funds). In September and October 1995, AT&T sent two more letters to Sportfolio (holding $591,524.97 of September funds and holding $23,989.76 of October funds).

On October 12, 1995, AT&T sent a written notice to Sportfolio via overnight delivery, which Sportfolio received the next day. In the notice AT&T stated:

> Pursuant to Sections 7A and 7B of the Billing Services Agreement between AT&T and Sportfolio Publications, AT&T will terminate Premium Billing Services for the above 900 numbers effective immediately. AT&T has noticed significant calling volume increases and calling pattern changes that appear to

> indicate that the 900 service is being abused
> in violation of AT&T's tariff.

Sportfolio immediately called an AT&T representative to dispute the termination, but to no avail. Within six weeks of AT&T's termination, Sportfolio set up new 900 numbers and billing services through a different provider.

On October 10, 1997, Sportfolio filed a three-count complaint against AT&T in Massachusetts Superior Court. In Count I, Sportfolio alleged that AT&T breached the terms of the contract by withholding revenues collected on calls made to Sportfolio's sports information program. In Count II, Sportfolio alleged that AT&T breached the contract when it terminated the agreement without proper notice or cause. In Count III, which has not been appealed, Sportfolio alleged that AT&T engaged in unfair and deceptive business practices in violation of Mass. Gen. Laws ch. 93A.

The case was removed to the District Court of Massachusetts, based on diversity jurisdiction. AT&T filed a counterclaim that alleged Sportfolio owed AT&T $324,852.72 in collection fees for the calls that came from coin telephones. On November 13, 2001, the district court issued a lengthy opinion from the bench granting AT&T's motion for summary judgment on all three counts. The district court's ruling pertained only to the calls that originated from coin telephones and were disputed by the parties. The district court did not rule on the amount of money AT&T owed Sportfolio for the legitimate calls that the parties did

not dispute. The district court reserved for trial an "accounting and payment to Sportfolio of the amounts improperly withheld" for those calls. On February 14, 2002, the district court denied AT&T's counterclaim.

On March 13, 2002, AT&T notified the district court that it was prepared to pay Sportfolio a sum of money for the legitimate, undisputed telephone calls. Sportfolio agreed to this and on March 20, 2002, the district court ordered that AT&T pay Sportfolio the agreed upon sum for the legitimate, undisputed telephone calls. After the parties agreed to settle the claim for the undisputed calls for $63,810, the district court entered a final judgment for Sportfolio in that amount on April 16, 2002. AT&T did not appeal this judgment. The parties agree that the case now before us involves Sportfolio's appeal of the district court's grants of summary judgment on its claim involving the disputed calls made from coin telephones and its claim that AT&T breached the contract by terminating without proper notice or cause.

## II. THE LAW

As already noted, the operative law in the case is that of New Jersey. In <u>American Cyanamid Co.</u> v. <u>Fermenta Animal Health Co.</u>, 54 F.3d 177, 181 (3d Cir. 1995), the Third Circuit quoted from the New Jersey Supreme Court, which in discussing the interpretation of contracts stated, <u>inter</u> <u>alia</u>,:

> The judicial interpretive function is to
> consider what was written in the context of

-8-

the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose.

(quoting Atl. N. Airlines, Inc. v. Schwimmer, 96 A.2d 652, 656 (N.J. 1953)).

The district court, in interpreting the contract under New Jersey law, relied heavily on Kaufman v. Provident Life and Casualty Insurance Co., 828 F. Supp. 275, 282-83 (D.N.J. 1992). That court, in an opinion replete with case citations to the interpretation of contracts under New Jersey law, held inter alia, as follows:

> The appropriateness of granting summary judgment depends upon whether the contract terms at issue in this case are questions of contract construction or contract interpretation. The construction of an unambiguous term in a contract is exclusively with [] the court. Construction of contracts is a question of law.
>
> Whether a term is clear or ambiguous is also a question of law. An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations. The interpretation of ambiguous terms in a contract is generally a question of fact.

(citations and quotation marks omitted). We note the obvious, New Jersey law on the interpretation of contracts is not significantly different from that of most jurisdictions. See 5 Corbin, Contracts § 24.24 (Rev. ed. 1998); Restatement (Second) of Contracts § 206 (1981).

Sportfolio strives mightily, as it did in the district court, to convince us that the terms "callers" and "collected charges" are ambiguous and they raise issues of material fact that should be decided by a jury. Sportfolio asserted in Count I that AT&T breached the terms of the contract by withholding "collected charges" that AT&T obtained from "callers." On appeal, Sportfolio says that the district court erred in interpreting the word "callers," as that term is used in the contract. The parties differ on what "callers" means. Sportfolio says that a "caller" is the person or entity responsible for paying for telephone calls from a given telephone number, regardless of whether that person or entity actually placed the billable call. Thus, under this interpretation, NYNEX is a "caller" because it owned the coin telephones from which the disputed phone calls were made. To the contrary, AT&T contends that a "caller" is a person or entity who owns a phone that can be billed and because under the contract coin telephones cannot be billed, NYNEX is not a "caller."

> The district court held:
>
> I find that read as a whole, the contract at issue in this case is not ambiguous with regard to Sportfolio's purported right to payment from AT&T. It clearly provides that Sportfolio is entitled to get a percentage of payments that AT&T collects from customers who are defined in section 1B of the contract as callers.
>
> Contrary to Sportfolio's contention, it is not entitled to payment for calls which cannot be

-10-

billed by AT&T to callers because they came from pay phones or for some other reason.

We agree with the district court and further rule that Sportfolio's admission at oral argument that the disputed calls came from coin telephones bars any recovery by Sportfolio for those calls because the contract clearly provides that AT&T is not responsible for calls originating from coin telephones. Indeed, in response to our questioning at oral argument, counsel for Sportfolio agreed that his claim was that Sportfolio should collect a $25 service charge on all of the approximately 85,000 disputed calls made from coin telephones.

The contract unambiguously provides that AT&T does not pay for calls originating from coin telephones. The relevant tariff provision, which is incorporated into the contract by way of section 12, states:  "AT&T MultiQuest Service does not provide for:  . . . Calls Originating from Coin Telephones . . . ."  Thus, although it might be argued that the word "caller" is ambiguous, this does not make any difference because the contract specifically states that AT&T is not responsible for calls originating from coin telephones.  In our view, this was the point the district court was making when it stated:  "[c]ontrary to Sportfolio's contention, it is not entitled to payment for calls which cannot be billed by AT&T to callers because they came from pay phones or for some other reason."

Because we have ruled that calls from coin telephones cannot be charged to AT&T under the contract-tariff provisions, it follows inevitably that calls from coin telephones were not made by "callers" as that term is used in the contract. Under the contract, AT&T promised only to "collect charges" from "callers." AT&T is, therefore, not responsible for "collecting charges" for calls made from coin telephones. This conclusion means that we do not need to address appellants' argument on the ambiguity of "collected charges."

There is, however, another issue we must address. Sportfolio claims that AT&T breached the terms of the contract by terminating the agreement in (1) violation of an implied covenant of good faith and fair dealing and (2) without proper notice. Sportfolio claims that AT&T acted in bad faith when, during the three month investigation, it charged Sportfolio for the service, i.e., 10 percent of $25, on the disputed calls and then refused to pay Sportfolio the remaining $22.50 for these calls. Sportfolio maintains that AT&T knew the 900 number was being abused but still allowed the abuse to continue for the purpose of collecting revenue from NYNEX that it did not intend to pay Sportfolio. In effect, Sportfolio says that AT&T increased its revenue while allowing Sportfolio to be injured. Sportfolio further argues that AT&T breached the contract by not giving advance notice. AT&T, on the other hand, argues that the unusual volume and pattern of the

aberrant calls constituted proper grounds for AT&T to exercise its right to terminate the agreement "immediately by notice to you."

The termination provision of the contract states:

7. TERMINATION

A. <u>AT&T reserves the right to terminate this Agreement or billing for any offer(s) provided under this Agreement immediately by notice to you, if AT&T determines, in its sole discretion, that (1) AT&T's tariffed services may be adversely affected by the offer(s) or the provision of Billing Services under this Agreement</u>, (2) that the offer(s) or the provision of Billing Services may adversely affect AT&T's public image or damage AT&T's reputation or goodwill, or (3) in any geographic area served by a LEC where such LEC fails to provide any necessary billing services at rates acceptable to AT&T.

(emphasis added).

We affirm the district court's grant of summary judgment as to these two issues. AT&T's termination of the contract was proper because the contract explicitly states that AT&T reserves the right to terminate the agreement immediately, if it determined, <u>in its sole discretion</u>, that its services, public image or goodwill were adversely affected. We agree with the district court that the suspicious calls gave AT&T a reasonable basis upon which to terminate the agreement. In addition, AT&T gave adequate notice of the termination. AT&T mailed a written notice of the contract

-13-

termination on the same day that it terminated the contract.  The notice was sent via overnight delivery and was received by Sportfolio the next day.  The agreement simply required that AT&T give notice; AT&T was not required to give advance notice.

In regard to the implied covenant of good faith and fair dealing, Sportfolio never raised this argument in the district court.  This argument will not be considered on appeal because "[t]he law in this circuit is crystalline:  a litigant's failure to explicitly raise an issue before the district court forecloses that party from raising the issue for the first time on appeal."  Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 180 (1st Cir. 1993).

The judgment of the district court is **Affirmed**.  Costs on appeal awarded to AT&T.

APPENDIX

The relevant portions of the contract are as follows:

1.      BILLING SERVICES

        A.      Acting as your agent, AT&T will
                perform the following services
                associated with your offer(s):
                secure usage records; message
                processing; bill processing; bill
                rendering, inquiry, and collection
                and remittance services.

        B.      Your customers ("Callers") will be
                billed for the charges associated
                with your offer(s).  AT&T will
                remit collected charges to you,
                less any fees as indicated in this
                Agreement.

        C.      To the extent necessary, AT&T's
                undertaking will include good
                faith efforts to secure billing
                services from Local Exchange
                Companies (LECs) where the same
                arrangements for billing of AT&T
                services are provided by the LECs
                to AT&T.   This Agreement is
                expressly contingent upon AT&T's
                ability to secure necessary
                Billing Services, if any, from the
                LECs.


2.      CALLER INQUIRY AND ADJUSTMENTS

        A.      AT&T will undertake good faith
                efforts to collect your charges
                from your Callers.  However, AT&T
                may remove from a Caller's bill
                any amounts associated with the
                offer(s) which the Caller disputes
                or refuses to pay.

        B.      Where amounts have been removed
                from a Caller's bill, you will
                remain obligated to AT&T and will

be billed by AT&T for AT&T's billing fee for the call, and for the transmission charges and any related AT&T charges for Network Service (network services and service features) actually provided in connection with the call.

3. CHARGES/REMITTANCE

A. Within 60 days after the month in which the calls were made to Customer's Program(s), AT&T shall remit to Customer the net amount of Customer's charges for the billing period provided that AT&T may delay payment for up to 90 days a) based on the results of credit checks obtained by AT&T under Section 20 of the Agreement, or b) if the Customer is being transitioned from a 90 day payout. Notwithstanding the above, AT&T may continue to delay all or a portion of payment in accordance with Section 19 of the Agreement.] The Net Amount shall be calculated by subtracting the following amounts from the charges collected.

[ . . . ]

1. Charges for Network Services provided in connection with your offer;

2. Any amounts which have been removed from callers' bills as a result of a dispute or refusal to pay;

3. Any federal, state, and local taxes . . .;

4. AT&T billing service fee. The AT&T MultiQuest Interacter and AT&T MultiQuest HICAP billing fee is 10% of your charge to callers for each call made during the billing period.

-16-

[ . . .]

6.    TELEPHONE NUMBER CHANGES

You have no ownership or other interest in the telephone number(s) assigned to you in connection with AT&T's provision of Billing Services, and AT&T reserves the right to change such numbers(s) whenever AT&T determines that such change is necessary to effectively provide Billing Services, including but not limited to a change in the offer(s) or a change in your charges for the offer(s). Upon termination of this Agreement, AT&T will assign you a different telephone number(s) if you elect to continue Network Services.

7.    TERMINATION

A.    AT&T reserves the right to terminate this Agreement or billing for any offer(s) provided under this Agreement immediately by notice to you, if AT&T determines, in its sole discretion, that (1) AT&T's tariffed services may be adversely affected by the offer(s) or the provision of Billing Services under this Agreement, (2) that the offer(s) or the provision of Billing Services may adversely affect AT&T's public image or damage AT&T's reputation or goodwill, or (3) in any geographic area served by a LEC where such LEC fails to provide any necessary billing services at rates acceptable to AT&T.

B.    If you breach any provision of this agreement, of if AT&T receives any complaints regarding your AT&T MultiQuest interacter/AT&T MultiQuest HICAP/AT&T MultiQuest Broadcaster and/or Card Counter messages,

-17-

representations, promotions, advertising, products or services, or if any claims are made against AT&T arising from them, then AT&T may immediately terminate this Agreement and all Billing Services rendered under it. In addition, on receipt of any claim or complaint, against you in connection with its use of AT&T's Billing Services, the parties agree that AT&T may deposit all amounts then or thereafter due to you in an escrow account pending the resolution of all such claims and complaints.

C.     Either party may terminate the Agreement without cause at least thirty (30) days prior written notice to the other party specifying the exact date and time of such termination.

[ . . . ]

12.    TARIFFED SERVICES

Your subscription to Network Services is subject to any and all tariff provisions related to such Network Services, to the extent the services are tariffed. This Agreement does not govern or affect tariffed services. Where anything in this Agreement conflicts with any tariff governing the provision of Network Services, the tariff shall apply. Charges under this Agreement will not be abated or refunded in the event of outages or degradation in tariffed services, and charges for tariffed services will not be abated or refunded in the event of delay or failure of performance of this Agreement.

[ . . . ]

14.    LIMITATIONS OF LIABILITY

[ . . . ]

C.    [ . . . ] AT&T shall not be liable for incidental, indirect, special

-18-

or consequential damage or for lost profits, savings or revenues of any kind, whether or not AT&T has been advised of the possibility of such damages.

[ . . . ]

18.   GENERAL

A.   Any supplement, modification or waiver of any provision of this Agreement must be in writing and signed by authorized representatives of both parties.

[ . . . ]

F.   This is the entire agreement between the parties with respect to the services provided hereunder and supersedes all prior agreements, proposals or understandings, whether written or oral.

G.   This agreement shall be construed in accordance with and governed by the local laws of the State of New Jersey.

19.   AUTHORIZATION TO APPLY FUNDS TO ANTICIPATED REFUNDS AND OUTSTANDING DEBTS

Customer hereby authorizes AT&T to adjust payment of funds to Customer in accordance with AT&T's Caller Adjustment Process ("CAP") to reflect anticipated caller refunds which may be requested by callers for up to twelve (12) months following the date of the call. Customer authorizes AT&T to delay payment of funds at any time during the contractual relationship, continuing for up to twelve (12) months following termination of Customer's Premium Billing Services. Customer further authorizes AT&T to apply any payments so delayed to any outstanding debt incorrect by

Customer.  Customer understands and agrees
that AT&T may modify CAP from time to time.

[ . . . ]

The relevant portion of the tariff is as follows:

Tariff F.C.C. No. 1

5. 4. 1. General

AT&T MultiQuest Service calls are dialed and completed
without the assistance of a Company Operator.  AT&T
MultiQuest Service does not provide for:

- Calling Card Calls
- Calls Originating from Coin Telephones
- Third Number Billed Calls
- Calls Requiring Charge Quotation
- Operator Assisted
- Hotel/Motel/Hospital Guest Extension Calls
- International Calls
- Collect Calls

[ . . . ]